--------------------------------------------------------

Examination Under Oath Of:

CRAFTON MOORE

Claim No. 499W10651

At The Instance Of:

STATE FARM

--------------------------------------------------------

Examination under oath of CRAFTON MOORE, taken at the instance of STATE FARM, before JODI L. TYLEY, a Registered Professional Reporter and Notary Public in and for the State of Wisconsin, at Ryan Law Firm, LLC, 18000 West Sarah Lane, Brookfield, Wisconsin, on Friday, August 25, 2017, commencing at 12:03 p.m. and concluding at 2:42 p.m.

EXHIBIT C
Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 1 of 42   Document 10-3

```
          A P P E A R A N C E S
RYAN LAW FIRM, LLC, by
MR. JOSEPH M. RYAN,
18000 West Sarah Lane, Suite 210,
Brookfield, Wisconsin 53045.
appeared on behalf of State Farm.
MR. MICHAEL M. KRILL,
Attorney at Law,
735 North Water Street,
Milwaukee, Wisconsin 53202,
appeared on behalf of Crafton Moore.

              * * * * *

       A L S O   P R E S E N T

Mr. John Perreault, State Farm.

              * * * * *

          I N D E X
```

```
Examination By:                           Page
Mr. Ryan.................................    4
Exhibits Identified:                      Page
Exhibit 1 - Tax Bills....................   14
Exhibit 2 - Non-Sworn Affidavit From Celia Moore...  38
Exhibit 3 - Copy Of The Lease............   87
Exhibit 4 - Ms. Williams' Statement......   93
Exhibit 5 - Report Dated April 17, 2017, Drafted
             By Michael P. Quick.........  101
Exhibit 6 - Copy Of Statement............  114
```

```
          I N D E X   C O N T ' D
```

```
Requests By Mr. Ryan:                     Page

- Photos Of The Property After
  Ms. Grandy Lived There But Before The Fire
  Happened................................   46
- Accounting From The Small Claims Action
  Itemizing All The Damage................   51

              * * * * *
```

```
Disposition Of Original Exhibit/s:

Attached To Original Transcript.
```

1  TRANSCRIPT OF PROCEEDINGS
2       CRAFTON MOORE, called as a witness
3  herein, having been first duly sworn on oath, was
4  examined and testified as follows:
5               EXAMINATION
6  BY MR. RYAN:
7  Q   Could you tell me your name, please?
8  **A   Crafton Moore.**
9  Q   Crafton, C-R-A-F-T-O-N?
10 **A   Yes.**
11 Q   Moore, M-O-O-R-E?
12 **A   Yes.**
13 Q   Mr. Moore, have you ever had your deposition or
14     examination under oath taken prior to this?
15 **A   Yes.**
16 Q   How many times?
17 **A   Twice.**
18 Q   Can you tell me just briefly about each one?
19 **A   Just asked a lot of questions.**
20 Q   What were they about?  Was it, like, a car
21     accident?
22 **A   Oh, about the fire.**
23 Q   This fire?
24 **A   Yes, this one.**
25 Q   Okay.  Perhaps I'm not clear.  Let me just clarify

1  for the record here.  What I mean by "examination
2  under oath" or "deposition," I mean you sit down
3  with a court reporter who has just swore you in.
4  **A   Oh, no.  No.  It was with Mister --**
5  Q   Are you talking about Mr. Perreault, when you gave
6      your recorded statement?
7  **A   Yeah.**
8  Q   Now, although we're not in a courtroom here, we
9      still have a court reporter here who swore you in.
10     You understand that the penalty of perjury applies
11     as though we were in a courtroom?
12 **A   Uh-huh.**
13 Q   Yes?
14 **A   Yes.**
15 Q   I'm going to go over some ground rules with you.
16     I'm not trying to be rude.  When I say "yes,"
17     because we have a court reporter taking down what
18     we're saying, there's certain rules we have to
19     follow in order to keep a clean transcript.  The
20     first one is that you need to give a verbal
21     answer, so no shaking of the head or nodding of
22     the head because that would be on the transcript
23     as "head nod" or "head shake."  While it's
24     generally accepted that a nod is a "yes" and a
25     shake is a "no," some confusion could be had, so

EXHIBIT C

**Page 6**

1  if you shake your head or nod your head I'll say,
2  "Is that a yes?" "Is that a no?" I'm not trying
3  to be rude. I'm just trying to keep a clean
4  record.
5      The second one is no "uh-huh" or
6  "uh-uh," for the same reason. It will just be
7  "U," "Hs," and "Ms" on the transcript. We don't
8  know whether or not that means yes or no, so if
9  you say "uh-huh," I'll say, "Is that a yes?" And
10  I'm not trying to be rude. It's just for the
11  record. Fair?
12 A  Yes.
13 Q  And also, because we have a court reporter taking
14  down what we're saying, we have to have kind of an
15  unnatural conversation. In everyday conversation,
16  people tend to interrupt one another to keep the
17  conversation moving. And here, we have to avoid
18  doing that, otherwise, we'll have interruptions in
19  our transcript. So if you could wait until I'm
20  done asking a question before you give an answer,
21  and I'll wait until you're done answering before I
22  ask another question, we'll have a clean
23  transcript. Is that fair?
24 A  Yes.
25 Q  And then if for whatever reason you don't

**Page 7**

1  understand a question that I'm asking, it's just
2  long, doesn't make any sense, double negative,
3  whatever, let me know and I'll try to rephrase it,
4  we can have the court reporter read it back, and
5  do whatever we need to do to rectify the
6  confusion. But if you do answer a question I ask,
7  I'm going to assume you understood it. Is that
8  fair?
9 A  Yes.
10      MR. KRILL: Joe, before we start -- can
11  we go off the record?
12      (Discussion off the record.)
13 BY MR. RYAN:
14 Q  I think I just got done going over the rules.
15  Now, is there anything that would prevent you from
16  answering questions truthfully today?
17 A  No.
18 Q  Before your examination today, did you review
19  anything in preparation?
20 A  No.
21 Q  I see you have some papers in front of you. Can
22  you tell me what those are?
23 A  Documents from my lawyer.
24      MR. KRILL: Retainer agreement.
25      THE WITNESS: Yeah.

**Page 8**

1 BY MR. RYAN:
2 Q  Could I just see it quickly?
3 A  (Witness complies.)
4 Q  We're here, obviously, for a fire that occurred, I
5  have it on March 4, 2017, does that sound right to
6  you?
7 A  Yes.
8 Q  Now, before we get into the facts surrounding the
9  fire and all of what happened before then and
10  after that, I understand you had a tenant, et
11  cetera, that moved out, I just want to get a
12  little background information about you. So can
13  you just tell me, what's your current address?
14 A  3949 North 24th Street, Milwaukee, Wisconsin.
15 Q  And you've lived there for what, 20-plus years?
16 A  Yeah, 20, 30 years.
17 Q  Now, what's your current age and date of birth?
18 A  I'm 47,    -69.
19 Q  You've lived in Milwaukee your whole life?
20 A  Yes.
21 Q  Could you give me a brief description of your
22  educational background?
23 A  High school diploma.
24 Q  Where did you go to high school?
25 A  South Division.

**Page 9**

1 Q  When did you graduate?
2 A  I didn't graduate from there, but I had graduated
3  from -- what's the name of that?
4 Q  Like a GED program?
5 A  Yes.
6 Q  When did you get your GED?
7 A  '07.
8 Q  So what was your expected graduation date from
9  South Division?
10 A  '88.
11 Q  And what was your highest grade completed prior to
12  getting your GED in '07?
13 A  Eleventh.
14 Q  Then you went back in '07 and completed twelfth
15  grade?
16 A  Yes.
17 Q  Do you have any schooling beyond that, whether
18  it's like a certificate class or anything at all?
19 A  Yes. I have a lead abating certificate, different
20  construction-type certificates.
21 Q  Where did you receive them?
22 A  From North Scott Development Center.
23 Q  North what?
24 A  North Scott.
25 Q  Can you spell Scott for me, please?

EXHIBIT C
Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 3 of 42   Document 10-3

1  A  S-C-T -- S-C-O-T-T.
2  Q  North Scott. Okay. And when did you get those,
3      just approximately?
4  A  2013.
5  Q  Now, did you get them to try to get into
6      construction work or to work on your own
7      properties?
8  A  For both.
9  Q  And before we get into your employment, are you
10     married, have any kids?
11  A  Two kids.
12  Q  Married?
13  A  No.
14  Q  Have you ever been married?
15  A  No.
16  Q  How old are your children?
17  A  30 and 28.
18  Q  Did you ever speak with your children about the
19     facts surrounding this loss?
20  A  No.
21  Q  Are either of your children aware that this fire
22     happened?
23  A  I think so.
24  Q  Both?
25  A  I think both of them know.

1  Q  Could you tell me starting with the 30-year-old
2      your children's first and last names?
3  A  Kentrell Thornton Moore.
4  Q  Can you spell Kentrell?
5  A  K-E-N-T-R-E-L-L.
6  Q  And that's Thornton, T-H-O-R-N-T-O-N?
7  A  Yes.
8  Q  And the 28-year-old?
9  A  Jonika Moore.
10  Q  Can you spell that, please?
11  A  J-O-N-I-K-A.
12  Q  Now, do you recall what, if anything, you
13     discussed regarding this fire loss with your two
14     children?
15  A  I didn't discuss nothing with them. I think they
16     just knew somehow. I don't know.
17  Q  Do you have any recollection of telling them there
18     was a fire at this place or --
19  A  Well, probably, like, when I was, like, over at
20     the house doing something or something like that.
21     I was probably cutting the grass, probably at the
22     house cutting the grass where the fire was or
23     something like that.
24  Q  So if I'm understanding you correctly, you're
25     there doing something, they call you, and you say,

1      "I'm at the house where the fire was"?
2  A  Yes.
3  Q  Something like that?
4  A  Yes.
5  Q  Have you been to the house where the fire was
6      since the fire happened?
7  A  Yes. I had to come with the insurance agent.
8  Q  Just to let people in and out?
9  A  No. They can unscrew -- the door was gone.
10  Q  So why would you have to go?
11  A  They wanted to talk to me.
12  Q  Okay. And then do you keep up with the yard work
13     there?
14  A  Yes.
15  Q  How often do you do that?
16  A  Probably every two weeks or something, like every
17     two weeks, once a month, whatever it needs.
18  Q  When is the last time you were at the property?
19  A  Two days ago.
20  Q  Does it still, you know, have the tarp up and
21     boarded up and everything?
22  A  Yes.
23  Q  Now, I understand you own in addition to this
24     property, some other properties?
25  A  Yes.

1  Q  How many total properties do you own?
2  A  Nine.
3  Q  I understand that you acquired six of them
4      approximately at the same time?
5  A  Yes.
6  Q  Did you have any properties prior to acquiring the
7      six at the same time?
8  A  Yes.
9  Q  And did you have three more properties?
10  A  Three.
11  Q  Now, the three prior properties, were those all
12     acquired at the same time or at different times?
13  A  Different times.
14  Q  How long have you owned the prior three
15     properties?
16  A  Since '09 or '10.
17  Q  And then when did you buy the six properties?
18  A  2015, like April or something.
19  Q  And you bought those from the city?
20  A  Yes.
21  Q  And were they foreclosure properties?
22  A  Yes.
23  Q  Were the three prior properties that you owned
24     city properties as well, foreclosures?
25  A  One was.

EXHIBIT C

Page 14

1  Q   What about the other two?
2  A   No.
3  Q   Were they just up for sale and you bought them?
4  A   No. One was my parents' house, and the other I
5      just bought.
6  Q   Something you found on-line or did you see a sign?
7  A   Yeah.
8  Q   Do you know which?
9  A   I bought it -- as a matter of fact, I think the
10     person was -- I think -- yeah. I bought it from
11     the city. I bought that from the city, too.
12 Q   I have your tax bills here. We can just do this
13     rather quickly, I imagine.
14         (Exhibit No. 1 was marked.)
15 BY MR. RYAN:
16 Q   Exhibit 1, this is a tax bill. There's nine
17     different ones, and I assume this is all the
18     properties you own. I'm going to number the pages
19     1 through 9. Page 1 is 4678 North Parkway. Can
20     you tell me if that was one of the six or one of
21     the three properties you owned prior?
22 A   That's one of the six.
23 Q   Now, the six properties, did you buy them in one
24     lump sum payment?
25 A   Yes.

Page 15

1  Q   How much were all six of them?
2  A   Like 30,000.
3  Q   Did you have to take out a loan for that?
4  A   No.
5  Q   Did you just have the cash laying around?
6  A   Yeah. I had the cash, yes.
7          MR. KRILL: Object to the form of the
8      question. What do you mean by "cash laying
9      around"?
10         MR. RYAN: Liquid.
11         MR. KRILL: Subject to that. Go ahead
12     and answer.
13 BY MR. RYAN:
14 Q   Prior to buying these six properties, what did you
15     do for work?
16 A   I was doing construction and I was a PCW.
17 Q   What's a PCW?
18 A   A personal health care person.
19 Q   The construction you were doing, was that on your
20     own or did you work for somebody?
21 A   I was working for North Scott then.
22 Q   Were you a W-2 employee?
23 A   Yes.
24 Q   Were you salaried or hourly?
25 A   Hourly.

Page 16

1  Q   What was your hourly rate?
2  A   Ten.
3  Q   What did you make as a personal health care
4      person?
5  A   $10 an hour, too.
6  Q   So in the years before -- strike that. You were
7      working for North Scott as a personal health care
8      provider, and then you had these three other
9      properties prior to purchasing these six
10     properties.
11 A   Yes.
12 Q   Do you have any idea what your income was a year
13     prior to purchasing these six properties?
14 A   Prior to purchasing the six properties, no, not
15     right offhand. It was right about 60,000 or
16     something like that.
17 Q   So that would have been in 2015, 2014, 2013, you
18     were making 60,000 a year?
19 A   About 60, somewhere around there. I can't recall
20     offhand.
21 Q   Do you know what years the 60,000 a year you were
22     making -- strike that. Do you know what years you
23     were making $60,000 a year?
24 A   No. I wasn't keeping up with it like that,
25     because some of the properties would fluctuate

Page 17

1      here or there, so I didn't really know -- like,
2      some properties I probably didn't have tenants in
3      it, so it would go up and go down, so.
4  Q   Well, you filed tax returns, correct?
5  A   Yes.
6  Q   And on your tax returns, does it show you making
7      $60,000 a year?
8  A   It should show close to it, yes.
9  Q   For what years?
10 A   Like, '13 I suspect, I think '14, too.
11 Q   What about 2015?
12 A   You've got the paper right there.
13 Q   I don't have 2013.
14 A   I don't remember right offhand.
15 Q   Okay. Now, in 2013 and 2014, was your sole income
16     from North Scott and personal health care and
17     these three properties?
18 A   Yes.
19 Q   I think I do have 2015 taxes. I have 2016 taxes.
20     In 2016, I have your gross income at about
21     $16,500. Why the change in your income between
22     2014 and 2016?
23 A   Cause I was laid off. I wasn't working at North
24     Scott no more.
25 Q   When did you stop working at North Scott?

EXHIBIT C

Page 18

1   A   Like, '14.
2   Q   Any other reason aside from your discontinued
3        employment at North Scott?
4   A   What was the reason?
5   Q   Right.
6   A   The job ended.
7   Q   I have '15 as well. No. I'm sorry. My question
8        was, is there any other reason, aside from your
9        stopping at North Scott, for the reduction of your
10       income from 2014 through 2016? I'm looking at
11       your 2015 taxes now which show a gross income of
12       $19,903, so it would have been a drop in income
13       from $60,000 a year in 2013 and 2014 to about
14       20,000 in 2015 and then another drop in 2016. Can
15       you explain to me what happened?
16  A   At first I had my houses as rooming houses so I
17       was getting more income out of them, but then it
18       became too much of a headache, so I started
19       renting them, like, as single family.
20  Q   So you had them as rooming houses?
21  A   Yes.
22  Q   What does that mean?
23  A   Like I would rent rooms for the month.
24  Q   So you'd have multiple people --
25  A   Yes.

Page 19

1   Q   -- perhaps that didn't know each other, just
2        renting a room?
3   A   Yes.
4   Q   And that brought you more income than just
5        single-family housing?
6   A   Yes.
7   Q   And why did you stop renting rooms?
8   A   It was too much of a headache.
9   Q   Why is that?
10  A   People weren't getting along and stuff like that.
11  Q   So they would kind of use you as the mediator?
12  A   And I couldn't get no sleep.
13  Q   You didn't want to do that?
14  A   No. I was tired of that.
15  Q   How long did you rent out units as rooming
16       housing?
17  A   Three years.
18  Q   Does that include the properties you acquired in
19       2015?
20  A   No.
21  Q   So none of those were ever rooming houses?
22  A   No.
23  Q   Just the other three properties?
24  A   Yes.
25  Q   All right. So we've got the Parkway property, you

Page 20

1        said, which was one you bought from the city as a
2        part of the six?
3   A   Uh-huh.
4   Q   Yes?
5   A   Yes.
6   Q   And then the North 13th Street property, that's
7        the subject property here, correct?
8   A   Yes.
9   Q   And that's another one you purchased as part of
10       the six?
11  A   Yes.
12  Q   Do you recall what you paid for this property, the
13       13th Street?
14  A   Around $5,000 or something like that.
15  Q   The 37th Street property?
16  A   Which 37th? I have two different ones.
17  Q   3723.
18  A   Yes. That was in the six.
19  Q   So that's page 3. For the record, page 2 is the
20       13th Street property as part of the six. Page 3
21       is the 3723 North 27th Street, also part of the
22       six purchased from the city. 3956 North 24th
23       Place, which is page 4 of Exhibit 1. Was that
24       purchased as part of the six as well?
25  A   Yes.

Page 21

1   Q   Page 5 of Exhibit 1 is 2423 to 2425 North 37th
2        Street?
3   A   No. That's not one of the six.
4   Q   So page 5 you owned prior to purchasing the six
5        properties?
6   A   Yes.
7   Q   How long did you have that property?
8   A   I had that since, like, '10.
9              MR. KRILL: What property are you
10       talking about?
11             MR. RYAN: 2425 North 37th Street,
12       page 5 of Exhibit 1.
13             MR. KRILL: Okay.
14  BY MR. RYAN:
15  Q   Then we've got 5048 North 32nd Street, which is
16       page 6 of Exhibit 1.
17  A   That's one of the six.
18  Q   And then 8493 North 107th Street, page 7 of
19       Exhibit 1.
20  A   That's one of the six, too.
21  Q   And then I assume by process of elimination, these
22       last two are not part of the six, which would be
23       5048 North 32nd Street?
24  A   5048 North 32nd? I thought you just said that
25       one.

EXHIBIT C
Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 6 of 42   Document 10-3

Page 22

1  Q  I said 8493 North --
2  A  No, the next one.
3  Q  There must be duplicates. I'm sorry. This is
4     just stuff I grabbed from the stuff you gave me.
5     The last one is 5764 North 43rd Street.
6  A  That's one of the six.
7  Q  Now, do you have a property that we haven't talked
8     about that isn't here? I can show this to you.
9     This is what I received from you for property tax
10    bills for your properties.
11 A  What all addresses do you have?
12 Q  If you look, they're right here.
13 A  Okay. The one that's bent is not one of the six.
14 Q  What page is it?
15 A  That is --
16        MR. KRILL:  Page 4.
17        THE WITNESS:  Page 4, and 5 is not one
18    of the six. You don't have 24th Street. I guess
19    that's still in my mother's name.
20 BY MR. RYAN:
21 Q  What's the address?
22 A  3949 North 24th Street.
23 Q  You had that prior to purchasing the six
24    properties?
25 A  Yes.

Page 23

1  Q  Now, when you purchased the six properties, did
2     the 30,000 or so, did that come from your
3     construction job with North Scott and your
4     personal health care job?
5  A  Yes.
6  Q  As well as the other three properties you had?
7  A  Yes, and odd jobs I was doing, too.
8  Q  Like odd construction jobs?
9  A  Yes.
10 Q  Now, you said you stopped working at North Scott,
11    was it in 2014?
12 A  Yes.
13 Q  And what about doing personal health care, are you
14    still doing that?
15 A  Yes.
16 Q  Is it a relative that you take care of?
17 A  Yes.
18 Q  Who is the relative that you take care of?
19 A  It's my brother.
20 Q  How old is your brother?
21 A  Like, 58.
22 Q  Is he disabled or just an old-age type thing?
23 A  Not old age, but he's mentally impaired.
24 Q  Do you have any other brothers or sisters?
25 A  Yes.

Page 24

1  Q  How many?
2  A  I have seven altogether.
3  Q  To make it real simple, did you ever speak with
4     your brothers or sisters about this loss?
5  A  Yes.
6  Q  Which of them did you speak with?
7  A  One of my sisters.
8  Q  What's the name of your sister?
9  A  Celia Moore.
10 Q  Can you spell the first name for me?
11 A  C-E-L-I-A.
12 Q  Do you know her phone number?
13 A  No, not right offhand.
14 Q  Do you have it in your cell phone?
15 A  No.
16 Q  How do you get ahold of her when you get ahold of
17    her?
18 A  I just go to her house.
19 Q  Does she have a cell phone?
20 A  She has one.
21 Q  But you don't have her number?
22 A  Not right offhand.
23 Q  Have you ever spoken with her on her cell phone?
24 A  Yes. She usually calls me.
25 Q  But you didn't save the number.

Page 25

1  A  No. I didn't save the number. I see her mostly
2     every day, so.
3  Q  Do you see her every day?
4  A  Basically.
5  Q  What's the purpose -- what's the occasion for
6     seeing her every day?
7  A  We stay in the same house.
8  Q  Okay. Do you live in the upper or lower?
9  A  I live in the lower.
10 Q  And she lives in the upper?
11 A  She stays in the lower, too.
12 Q  Does anybody else live with you two?
13 A  My brother, he stays in the upper.
14 Q  What's your brother's name?
15 A  Mark Moore.
16 Q  Mark with a "C" or "K"?
17 A  With a "C" or "K"?
18 Q  M-A-R-C or M-A-R-K?
19 A  Oh, "K."
20 Q  Did you ever talk with your brother Mark about
21    this loss?
22 A  I think I might have mentioned something to him.
23 Q  Do you know his phone number?
24 A  873-5263.
25 Q  That's 414?

EXHIBIT C
Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 7 of 42   Document 10-3

1   A   Yes.

2   Q   Any other brothers or sisters that you spoke to

3      about this?

4   A   No, not really. No.

5   Q   Do all of your other brothers and sisters live in

6      the Milwaukee area?

7   A   Yes.

8   Q   And how long have you lived with Celia?

9   A   Right about -- since, like, 2013.

10   Q   And has it been only you two living together since

11      2013?

12   A   Yes.

13   Q   All right. Either of your children lived with you

14      in --

15   A   No.

16   Q   Since you left -- strike that. How much do you

17      make for the personal care of your brother? I'm

18      sorry. What's his name, the one you take care of?

19   A   Samuel Moore.

20   Q   How much do you make doing that?

21   A   $10 an hour.

22   Q   And how many hours a week do you work?

23   A   Like 30. No. Twenty-eight hours.

24   Q   Has that been consistent for the last five years?

25   A   Yes.

1   Q   Where does Mr. Samuel Moore live?

2   A   At 2425 North 37th Street.

3   Q   Is that a property you own?

4   A   Yes.

5   Q   Does he live with anybody else?

6   A   He has a friend stay there with him.

7   Q   Full time or just -- does the friend live with

8      him?

9   A   The friend lives with him, yes.

10   Q   Do you have a lease for that property, or is it

11      because it's your brother, it's just --

12   A   No, no lease with him.

13   Q   Does your brother Samuel pay rent?

14   A   Yes.

15   Q   Do you have any other family members living in any

16      of your other properties aside from your brother

17      who lives above you and your sister who lives with

18      you?

19   A   No.

20   Q   Now, of the nine properties you currently own, are

21      there any of them that are currently vacant?

22   A   Yes.

23   Q   How many?

24   A   Two.

25   Q   At the time of this loss, which would have been

1      March of 2017, how many properties, if any, were

2      vacant?

3   A   Two.

4   Q   Is it the same two that are vacant now?

5   A   Yes.

6   Q   Do they need work or need to be rehabbed or --

7   A   Yeah. They need work.

8   Q   So they are not tenantable?

9   A   Not tenantable, no.

10   Q   Now, are those two part of the six that you

11      purchased or --

12   A   Yes.

13   Q   And are you currently working on rehabbing them

14      now?

15   A   Yes.

16   Q   Do you do all of the work yourself?

17   A   Some.

18   Q   And some stuff, I guess, you hire out?

19   A   Yes.

20   Q   What do you hire out typically?

21   A   Electric and plumbing, basically.

22   Q   Do you have anybody that typically helps you out

23      doing work on your properties?

24   A   It varies, different people. They come and go.

25   Q   Do you have anybody that you use regularly?

1   A   On what, the electrical or whatever?

2   Q   Just keeping your properties in working condition.

3   A   No. I usually do all the work.

4   Q   Now, do you have any credit card debt?

5   A   No.

6   Q   Do you have any credit cards?

7   A   Yes.

8   Q   And you don't carry a balance on any of them?

9   A   Uh-uh.

10   Q   No?

11   A   What do you mean "balance," like owing on them?

12   Q   Yeah. So at the end of each month, you either pay

13      off the card in full or you pay the minimum

14      payment and you carry a balance forward.

15   A   Oh, sometimes -- it depends. Sometimes I pay in

16      full. Sometimes I have a balance.

17   Q   What about right now? Are you carrying a balance

18      on your credit cards?

19   A   Yes. I have a balance on them.

20   Q   Okay. Can you tell me what credit cards you have?

21   A   I have a Capital One card.

22   Q   Is that it?

23   A   Yes. The rest is a bank card.

24   Q   Capital One. Now, what's your current balance on

25      it?

EXHIBIT C

Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 8 of 42   Document 10-3

**Page 30**

1 A   It's 500.
2 Q   What's your credit limit, if you know?
3 A   Seven.
4 Q   Seven thousand?
5 A   Seven hundred.
6 Q   Now, I saw in your bank records there were some
7     payments to Continental Finance. Can you tell me
8     what that is?
9 A   Oh, that's a bank card.
10 Q   Is it a bank credit card or debit card?
11 A   Yes.
12 Q   Which one?
13 A   It's a credit card, bank credit card.
14 Q   Do you owe any money on that card?
15 A   No. I just paid that one off.
16 Q   When did you pay it off and what was the amount?
17 A   Like, $300.
18 Q   And Continental Finance, you said it's a bank
19     card. What bank is it through? Is it Continental
20     Bank?
21 A   I don't know. It was, like, an on-line thing.
22 Q   All right. And then I saw something that said
23     "Advanta Credit."
24 A   Advanta. I got a loan back in the days from them.
25 Q   Do you still owe on that loan?

*(handwritten in left margin: It's a Cont Credit)*

**Page 31**

1 A   No.
2 Q   When did you pay that off?
3 A   A year-and-a-half ago.
4 Q   What was the loan amount?
5 A   About 5,000, 4,000.
6 Q   When did you take it out?
7 A   Right around 2014 I think.
8 Q   And you said you paid it off a year-and-a-half
9     ago, which would have been sometime in 2016?
10 A   Yeah.
11 Q   Early 2016?
12 A   Yeah, somewhere in there.
13 Q   I was looking at your bank statements, and I don't
14     want to go through and look to find your last
15     payment, I can do that later, but I saw one for a
16     Seaway Bank credit card.
17 A   That's my bank.
18 Q   Is it a credit card, a debit card?
19 A   Debit card.
20 Q   So you don't owe any money on that because it
21     pulls directly out of your account?
22 A   Yes.
23 Q   And then I saw Capital One payments, and that's a
24     credit card, right?
25 A   Uh-huh.

**Page 32**

1 Q   Yes?
2 A   Yes.
3 Q   All right. Aside from these cards, do you owe any
4     money to anybody else?
5 A   I owe -- who do I owe? What's the name? American
6     Dream.
7 Q   Is that a student loan or something like that?
8 A   No. It's a roofing place.
9 Q   I thought "American Dream" for some reason sounded
10     like a student loan. How much do you owe this
11     roofing place?
12 A   About 1,500 to 2,000.
13 Q   I assume it's for a roofing job they did?
14 A   Yes.
15 Q   For which property?
16 A   2423 North 37th Street.
17 Q   And when did they do the job?
18 A   I think it was in 2014 or '15, somewhere in there.
19 Q   Were you unhappy with the work they did, or was
20     there some other reason you didn't pay them?
21 A   No. I was somewhat satisfied with the work.
22 Q   What was the reason for not paying them?
23 A   They gave it to me as, you know, payment plans.
24 Q   What was the total amount of the job?
25 A   Like, 12,000, 13,000.

**Page 33**

1 Q   And is the reason that they haven't been paid yet
2     because you're still on the payment plan?
3 A   Yes.
4 Q   So you're not delinquent on their payments?
5 A   No.
6 Q   What's the payment plan they put you on?
7 A   It's, like, 250 a week. *(handwritten)*
8 Q   How do you pay them; money order, check?
9 A   Not money order. I go through, like, Western
10     Union.
11       MR. KRILL: 250 a week or a month?
12       THE WITNESS: A month. It's 250 a month
13     I meant.
14       MR. RYAN: I was going to say, that
15     should have been paid off by now.
16       MR. KRILL: Exactly.
17       MR. PERREAULT: There's interest.
18       THE WITNESS: Yeah, and there's interest
19     on it.
20 BY MR. RYAN:
21 Q   Do you pay anybody else through Western Union?
22 A   No. I don't think so.
23 Q   Do you owe anybody else any money other than what
24     we've discussed, other than credit cards and this
25     roofing company?

EXHIBIT C

Page 34

1  A  Uh-huh. I think I owe on a Home Depot card.
2  Q  Like a Home Depot credit card?
3  A  Yes.
4  Q  What do you owe on that?
5  A  I think around, about 1,500.
6  Q  Do you know what the limit is on that?
7  A  $3,000.
8  Q  I assume that's just for supplies you need for
9     your properties?
10 A  Yes.
11 Q  Is that it?
12 A  Yeah.
13 Q  Do you have any judgments or liens against you?
14 A  No.
15 Q  Do you owe any money on any of your properties?
16 A  No.
17 Q  Do you have a vehicle loan?
18 A  No.
19 Q  Do you own a vehicle?
20 A  Yes.
21 Q  What kind of vehicle is it?
22 A  Mercury SUV.
23 Q  Now, I saw two bank accounts. I think one was
24    Seaway and one was --
25 A  Oh, they merged. Seaway sold to Self-something.

Page 35

1     I forgot the name.
2  Q  Self-Help?
3  A  Self-Help.
4  Q  Self-Help Federal Credit Union. So Seaway bought
5     Self-Help?
6  A  Self-Help bought Seaway. That's why I was having
7     problems getting certain documents, because they
8     just transferred it all.
9  Q  So you only have one account with Self-Help,
10    formerly Seaway?
11 A  Yes.
12 Q  Have you ever had any other bank accounts in the
13    last five years?
14 A  No.  Yes
15 Q  Have you ever filed a bankruptcy?
16 A  Yes.
17 Q  When was that?
18 A  In -- I can't even remember. It was a long time
19    ago.
20 Q  More than seven years ago?
21 A  Yes.
22 Q  Was it in Wisconsin that you filed it, Milwaukee?
23 A  Yes.
24 Q  Have you ever had any gambling losses?
25 A  No.

Page 36

1  Q  Ever closed any financial accounts with a balance
2     owing?
3  A  No.
4  Q  I saw somewhere in these papers Howard's Business
5     Solutions. Is that who does your taxes?
6  A  Yes.
7  Q  How long have they done your taxes?
8  A  About three, four years.
9  Q  What about prior to that -- strike that. Let me
10    ask it this way. Did they do your taxes in 2013
11    and 2014?
12 A  No.  Yes
13 Q  Who did your taxes then?
14 A  Who did my taxes then? It was a young lady that I
15    knew. She did my taxes. Natasha Thomas.
16 Q  Did she work for a company or just do them out of
17    her house?
18 A  Out of her house.
19 Q  Do you know if you have copies of those returns?
20 A  No.
21 Q  No, you don't know, or, no, you don't have them?
22 A  No, I don't have them.
23 Q  There's a form, I can't remember the name of it,
24    that I'm going to send to you or send to your
25    attorney. The IRS will give you a snapshot of

Page 37

1     your return on one page, and I can't remember the
2     name of the form, but it allows me to just get the
3     snapshot of your return. I'll send that to your
4     attorney.
5         MR. KRILL:  Off the record.
6         (Discussion off the record.)
7  BY MR. RYAN:
8  Q  In looking through the documentation you sent to
9     me, I saw what appeared to be, like, a handwritten
10    affidavit, and I was wondering if you could just
11    explain to me what it means. We can mark it as an
12    exhibit if we need to, but basically says, "My
13    name is" -- who's that?
14 A  Celia Moore.  Celia
15 Q  And can you read it? I can't read upside down.
16        MR. KRILL:  "My name is Celia Moore.
17    I'm writing to verify that Crafton Moore came in
18    around 3:00 a.m. on March 4, 2017."
19 BY MR. RYAN:
20 Q  Okay. That's your sister?
21 A  Yes.
22 Q  Stating that you came home on March 4 when she was
23    there.
24 A  Yes.
25 Q  Okay. When I read it I saw "came in," and I'm

EXHIBIT C

Page 38

1    like, came in where?  It didn't make any sense to
2    me.  Why don't we just mark that?
3         MR. KRILL:  I didn't draft it.  Could we
4    take a quick break?
5         MR. RYAN:  Yeah.  I'm marking this, what
6    appears to be a non-sworn affidavit from Celia
7    Moore, as Exhibit 2.
8         (Exhibit No. 2 was marked.)
9         (Recess taken.)
10   BY MR. RYAN:
11   Q   We left off talking about the bankruptcy.  You
12       said it was more than seven years ago?
13   A   Yes.
14   Q   All right.  Had you owned any properties when you
15       filed that bankruptcy?
16   A   No.
17   Q   Was it a Chapter 7?
18   A   I think it was a Chapter 7.
19   Q   If you know.
20   A   I don't know.
21        (Cell phone rang.)
22        MR. KRILL:  I'm sorry.  Excuse me.
23   BY MR. RYAN:
24   Q   Other than this claim, have you ever made an
25       insurance claim of any kind; slip and fall,

Page 39

1    property claim, personal injury, et cetera?
2    A   Property.
3    Q   No personal injury claims?
4    A   No.
5    Q   What was the property claim?
6    A   It was storm damage to my house.
7    Q   Was that one of the rental properties?
8    A   Yes.
9    Q   Where was the damage?
10   A   The siding and the roof.
11   Q   What year was it?
12   A   '14.
13   Q   Any other property damage claims?
14   A   No.
15   Q   Did you have a theft claim for a vehicle in 1999?
16   A   Yeah.
17   Q   Can you tell me about that?
18   A   Somebody stole the car.
19   Q   What kind of car was it?
20   A   I think that was a Buick, like an '89 Buick or
21       something.  I don't know.
22   Q   How about an '89 Cadillac --
23   A   Fleetwood.
24   Q   It says "B-R-O-U-G-H-A-M."
25   A   That's the Brougham.

Page 40

1    Q   Did you ever have that car?
2    A   Yes.  I had that car before.
3    Q   Is that the car that was stolen?
4    A   Yes.  Several cars got stolen from me.
5    Q   Have you ever made an insurance claim for any of
6        the --
7    A   Yes.
8    Q   Was the Cadillac the only one you made an
9        insurance claim for?
10   A   No.
11   Q   Have you had --
12   A   Cadillac and a Buick.
13   Q   And a Buick?
14   A   Yes.
15   Q   Was the Buick before or after the Cadillac?
16   A   After.
17   Q   Do you know who the insurance carrier was for the
18       Buick?
19   A   No, not right offhand.
20   Q   Was the Buick recovered?
21   A   Yes.
22   Q   What condition was it in?
23   A   They had totaled it.
24   Q   Was it just damaged from crashing it?
25   A   Yes.  Somebody crashed it.

Page 41

1    Q   Was it your insurance carrier that paid you for
2        it?
3    A   Yes.
4    Q   You don't recall who it was?
5    A   Not right offhand.
6    Q   Do you have the same motor vehicle carrier that
7        you had back when this Buick was stolen?
8    A   Not -- no.
9    Q   Do you recall approximately when the Buick was
10       stolen?
11   A   Like I said, that was, like, the '90s.  That was
12       over twenty-some years ago.
13   Q   I've got '99 for the Cadillac, so if the Buick was
14       afterwards --
15   A   '99 for the Cadillac?
16   Q   That's what it says here.
17   A   No.  The Cadillac was way before -- well, I might
18       be mistaken.  I don't know when.  That's over
19       20 years.  I can't really remember.
20   Q   What happened to the Cadillac?  Was it recovered?
21   A   Yes, it was recovered.  Yeah.
22   Q   And what condition was it recovered in?
23   A   It was totaled.
24   Q   Was it totaled from crashing?
25   A   Somebody had took the whole front off and then

EXHIBIT C

Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 11 of 42   Document 10-3

Page 42

1    burnt it.
2  Q  Like took the whole front off, like the motor and
3     everything?
4  A  No.  The whole front clip, not the motor part.
5     They took some parts off of it, but they took the
6     whole front clip off.
7  Q  Like the bumper?
8  A  Bumper, side panels.
9  Q  And then they burned it?
10 A  Yeah.
11 Q  Do you know where it was recovered?
12 A  I don't remember right offhand.
13 Q  Did you have Globe American Casualty as your
14    insurance carrier?
15 A  I probably did.  I don't know.
16 Q  Does the name of that company sound familiar to
17    you, or also, Founders Insurance Company?
18 A  I don't know.  It sounds familiar, but I don't
19    know.  That was so long ago.
20 Q  Aside from the storm claim and the two vehicle
21    theft claims, have you ever had any other
22    insurance claims?
23 A  No, not that I remember.
24 Q  Now, aside from the vehicle you own currently and
25    the nine properties you have, do you have any

Page 43

1     other assets?
2  A  No.
3  Q  Aside from the income currently, as we sit here
4     today, or at the time of loss rather, did you have
5     any income aside from being a health care provider
6     to your brother and --
7  A  No.  Yes
8  Q  -- income from these properties?
9  A  No.  Yes
10 Q  No governmental assistance or anything like that?
11 A  No.
12 Q  All right.  Before we get to the loss, I want to
13    talk about the prior tenant you had.  What was her
14    name?
15 A  The one that got kicked out of the house?
16 Q  The one you evicted, yes.
17 A  Lillian.  I forgot her last name.  Lillian
18    something.
19 Q  Grandy?  G-R-A-N --
20 A  Grandy, yes.
21 Q  Now, she lived at the 13th Street property.
22 A  Yes.
23 Q  The one that was on fire, correct?
24 A  Yes.
25 Q  Did she live there with anybody else?

Page 44

1  A  She had several different roommates come in and
2     out.
3  Q  Did she have a lease, Ms. Grandy?
4  A  Yes.  I think I had a lease with her.  I think.  I
5     can't really remember.
6  Q  Do you have a copy of it?
7  A  No.  Not -- no.
8  Q  And you filed an eviction for her, correct?
9  A  Yes.
10 Q  In Milwaukee County Circuit Court?
11 A  Yes.
12 Q  Did you provide a copy of the lease to the court?
13 A  No.  I don't think I did.
14 Q  Do you know one way or the other whether you had a
15    written lease or just month-to-month tenancy with
16    no written lease?
17 A  I think it was just month-to-month.
18 Q  When did she move in?
19 A  July or August of -- was it '16?
20 Q  Did she live there for more than a year?
21 A  No.  She didn't live there no year.
22 Q  Six months?
23 A  Six or seven months.
24 Q  July or August of '16.  The eviction was filed in
25    '17?

Page 45

1  A  Yes.
2  Q  Now, between the time you bought the property
3     in '15 -- it was in '15, right?
4  A  Yes.
5  Q  -- and Ms. Grandy moving in in '16, did you have
6     any other tenants?
7  A  In that apartment, no.
8  Q  So she was the first tenant in the 13th Street
9     property?
10 A  Yes.
11 Q  Between the time you bought the property in '15
12    and the time Ms. Grandy moved in in '16, did you
13    do any work to the 16th Street property?
14 A  Yes.
15 Q  Could you give me an overview of the work that you
16    did?  Let me ask you this way.  When you bought
17    the property from the city in '15, was it
18    habitable?
19 A  No.
20 Q  What needed to be done in order to be able to rent
21    it out?
22 A  I had to do electric work, plumbing, furnaces,
23    like a whole overhaul.
24 Q  So did you redo, like, the electric through the
25    whole house, like the box and all the wiring?

BROWN & JONES REPORTING, INC.
414-224-9533

EXHIBIT C

## Page 46

1 A  Yes.
2 Q  How much did that cost you?
3 A  Around $1,500 to $2,000.
4 Q  To rewire the whole house?
5 A  Uh-huh.
6 Q  Yes?
7 A  Yes.
8 Q  I've got to do that to my house. If I could do
9     that for 1500 bucks, that would be great. All
10    right.
11 A  Obviously, the house is small, though.
12 Q  Mine isn't that big either. What about, what was
13    the condition of the inside like? Were there
14    holes in the walls, broken windows, anything like
15    that?
16 A  Yes, when I first got it.
17 Q  So did you have to do drywall work?
18 A  Drywall work.
19 Q  Did you have to replace any windows?
20 A  Yes.
21 Q  Do you have any photos of the property as it was
22    in the condition when you purchased it and before
23    you did any work on it?
24 A  No.
25 Q  Do you have any photos of the property after

## Page 47

1     Ms. Grandy lived there but before the fire
2     happened?
3 A  Yes. I have some.
4 Q  Do you still have those photos?
5 A  Yes.
6 Q  Could you provide them to your attorney?
7 A  Okay.
8 Q  And you provided -- I saw receipts in there. I
9     didn't go through them all because, frankly, there
10    are a lot of receipts, but did you provide
11    receipts for the electric work that was done?
12 A  Yes.
13 Q  And the plumbing work that was done?
14 A  Yes.
15 Q  Do you recall off the top of your head how much
16    the plumbing work was?
17 A  No, because different people came here and there,
18    so.
19 Q  Did you have to redo the plumbing in the whole
20    house?
21 A  Yes.
22 Q  You gutted it all out and replaced everything?
23 A  Yes. N D
24 Q  You said it needed a new furnace?
25 A  Yes.

## Page 48

1 Q  How much was the furnace?
2 A  Around $1,500, somewhere in there, installed and
3     everything.
4 Q  Do you know how much money you put into the house
5     before Ms. Grandy moved in?
6 A  Anywhere from ten -- about $10,000.
7 Q  And you keep all the receipts for all your
8     properties for the stuff you have do?
9 A  I try to.
10 Q  As much as you can?
11 A  Yeah.
12 Q  Did you provide all the receipts that you have for
13    this property to State Farm in terms of repair
14    that was done to the house after you bought it?
15 A  You're talking about 13th Street?
16 Q  Yes.
17 A  As much as I could, yes.
18 Q  Okay. Now, aside from the electric, plumbing,
19    furnace, fixing up some windows and wall repairs,
20    did you have to do anything else to the property?
21 A  I had to --
22 Q  And this is before Ms. Grandy moved in.
23 A  Yes. I had to -- in the back, there's, like, a
24    back porch thing, and I had to restructure that.
25 Q  You had to reframe it?

## Page 49

1 A  Yeah. Lift it up, get it back to even.
2 Q  Was it tilting or something?
3 A  Yes.
4 Q  How much did that cost you, or is that included in
5     the 10K?
6 A  No. It wasn't included in the 10K. I can't
7     really add up everything. I'd have to sit down
8     and really think about what all -- because
9     different people were coming and doing this or
10    doing that. I'm just giving you a rough estimate
11    of what it was.
12 Q  That's fine. Whatever you know. Before
13    Ms. Grandy moved in, did you put new carpet in the
14    place?
15 A  Yes.
16 Q  What about, like, a kitchen floor? Did you have
17    to replace that before she moved in?
18 A  No.
19 Q  Did you have to paint the house before she moved
20    in?
21 A  Yes.
22 Q  Did you have to paint the inside and outside?
23 A  Inside and out, yes.
24 Q  And did you do all this work yourself aside from
25    the electric and the plumbing?

EXHIBIT C

1  A  Yes.
2  Q  And the furnace?
3  A  Yes.
4  Q  Did you do the furnace yourself?
5  A  No.
6  Q  So the electric, plumbing and furnace you hired
7     out.
8  A  Yes.
9  Q  But you painted the inside and outside yourself?
10 A  Yes.
11 Q  What about the reframing of the back?
12 A  Somebody came and did that.
13 Q  So you did the carpet and painting?
14 A  Yes.
15 Q  What about the drywall work?
16 A  I did that.
17 Q  All right.  So that took you, to get all that
18    done, you know, approximately a year?  You bought
19    it in '15 so --
20 A  Yeah, because I was working on different houses.
21 Q  And then she moved in, you said, in August?
22 A  I think it was August.
23 Q  July or August of '16?
24 A  Somewhere in there.
25 Q  Grandy.  It's a name that's easily forgettable.

1     Now, what was Ms. Grandy paying in rent?
2  A  $700.
3  Q  Did she have to put down a security deposit?
4  A  No.  Yes, she did.  Yes, she did, but she never
5     did pay it all off, though.
6  Q  What was the security deposit?
7  A  It was $700, too.
8  Q  And before she moved in, did she pay you the
9     $1,400 for the first month's rent and security
10    deposit?
11 A  No.  She was a little short, and she was going
12    through something so I had looked out for her.
13 Q  What, if anything, did she put down for the
14    security deposit?
15 A  Altogether, I think she gave me, like, 900.
16 Q  So $200 for the security deposit.
17 A  Basically.
18 Q  Did you account for that in the small claims
19    action you filed against her?
20 A  Yes.
21 Q  Do you have an accounting from the small claims
22    action itemizing all the damage that she did and,
23    I guess, the $200 credit she had, et cetera?
24 A  Uh-huh.
25 Q  Yes?

1  A  I think I do.  I'd have to go back to my files.
2  Q  If you could --
3  A  I think I itemized it, yes.
4  Q  If you do have that, could you provide it to your
5     attorney, please?
6  A  Okay.
7  Q  Do you know if you filed it with the court?
8  A  Yes.
9  Q  So she gives you 900 bucks and moves in.  When she
10    moves in, do you know if she has any other
11    roommates or anything?
12 A  No.  At that point, she didn't have a roommate.
13    After she moved in she, like, let her sister or
14    somebody move in or whatever.
15 Q  So did you think you were renting only to one
16    person?
17 A  At first, yes.
18 Q  Did she ever ask you about having other people
19    move in?
20 A  No.
21 Q  Do you know what she did for work?
22 A  She was on assistance.
23 Q  Do you typically check that out, what people do
24    for work?
25 A  Yes, proof of --

1  Q  Proof of income?
2  A  Yes.
3  Q  Now, you evicted her, I assume, and correct me if
4     I'm wrong, because she stopped paying rent?
5  A  Yes.
6  Q  Did she stop paying rent or was she just short on
7     rent?
8  A  She had stopped.
9  Q  When did she stop paying rent?
10 A  January.  Was it December?  January.  Yeah, she
11    stopped in January.
12 Q  All right.  When is rent due?
13 A  By the 3rd.
14 Q  So rent would have been due January 3rd?
15 A  Yes.
16 Q  And how did she typically pay; drop a check off at
17    your house or --
18 A  No.  She'd just bring me cash.
19 Q  So she had paid rent, you know, through December
20    of '16 on time?
21 A  Yes.  Not always on time and was short here and
22    there.
23 Q  But by January 3rd, her account balance was zero?
24    Well, on January 2nd, January rent was not due
25    yet, but she had paid all her previous rent?

EXHIBIT C

**Page 54**

1 A   She still owed here and there.

2 Q   Do you know how much she owed you prior to January

3    rent being due?

4 A   Around $400 or $500.

5 Q   Does that include the -- I guess it can't, but

6    I'll ask anyway -- does that include the short

7    security deposit from when she moved in?

8 A   No.

9 Q   And then in January the 3rd rolls around, and I

10    imagine she doesn't pay rent, you call her up and

11    ask what's going on.

12 A   Yes.

13 Q   Did she give you a story?

14 A   She said she just got out of jail or something.

15 Q   Did she tell you she was going to pay you?

16 A   Yes. She says this and then she goes off. I

17    don't know. She's crazy. I don't know.

18 Q   And then at some point, you decide to file an

19    eviction.

20 A   Yeah, because she just kept going on and on and

21    wasn't really trying to come to an agreement with

22    me.

23 Q   I saw the complaint. I believe it was, like,

24    January 17. Does that sound right to you? I have

25    it as January 17, 2017, you filed the eviction.

**Page 55**

1 A   Yeah.

2 Q   When did you take the policy out on this property?

3 A   I think in January.

4 Q   Was it before or after you filed the eviction, if

5    you know?

6 A   Before. I think January 1 or December sometime.

7      MR. RYAN: I'm pretty sure I have the

8    policy inception date as January 24. Let's go off

9    the record for just one second.

10      (Discussion off the record.)

11 BY MR. RYAN:

12 Q   Assuming I'm correct that it's January 24, does

13    that comport with your recollection? I know you

14    just said you thought it was a little before

15    but --

16 A   Yeah, because I think we had problems getting the

17    insurance together. I think that's what prolonged

18    it.

19 Q   When did you first attempt to get insurance on

20    this property?

21 A   It was, like, the end of December, but he had to

22    come and check the roof, and there was a lot of

23    different stuff he had to do, and then it was the

24    holidays, and all this stuff was going on, so it

25    prolonged it.

**Page 56**

1 Q   Why did you wait until December of '16 to attempt

2    to get a policy on a property you've owned since

3    2015?

4 A   Because you can't get insurance on a vacant house.

5 Q   Oh, so this was the first time somebody lived

6    there?

7 A   Yes.

8 Q   And so she had lived there since July or August.

9    How come you waited until December?

10 A   Because I was fixing up the house here and there

11    and doing stuff to make sure the house was up to

12    code for when the insurance people came out.

13 Q   So when she was living there, the house wasn't up

14    to code?

15 A   Not all the way. She was staying there. That's

16    why I was giving her a break on rent here and

17    there, because I was still fixing up the house.

18 Q   When she moved in, what still needed to be done to

19    the house?

20 A   Just minor stuff. Like I was saying, I was

21    fixing -- the back piece had to be leveled back

22    out.

23 Q   Was that done after she moved in?

24 A   Yes. And I think they were still remodeling the

25    bathroom a little bit.

**Page 57**

1 Q   How many bathrooms are in there?

2 A   It was one.

3 Q   So did she have a working bathroom when she lived

4    there?

5 A   Yeah. It was working, but I was just remodeling

6    it a little more.

7 Q   And so is it -- I mean, correct me if I'm wrong,

8    but you waited for some time to get a policy

9    because, frankly, you just wanted to get the house

10    in better shape?

11 A   Yes.

12 Q   And then in December when you finally did get a

13    policy, did an agent come and look at the house?

14 A   Yes.

15 Q   And what did the agent tell you?

16 A   He wanted to look at the roof or something, but

17    there was snow on it or something, so he couldn't

18    see how the roof was, so he had to wait or do

19    something.

20 Q   Did the agent go inside the house?

21 A   Nope.

22 Q   Did they go around to the back --

23 A   Yes.

24 Q   -- and look at the structure?

25 A   Yes.

EXHIBIT C

**Page 58**

1 Q  Was the structure -- by the time they went there,
2    was the back --
3 A  It was fixed.
4 Q  It was fixed?
5 A  Yeah.
6 Q  So they couldn't look at the roof because there
7    was snow on it.
8 A  Yes.
9 Q  Did they want to come back to look at it?
10 A  Yes.  That's why it took so long.
11 Q  Do you know when they came back to look at the
12    roof?
13 A  No.  I don't know offhand.
14 Q  Did you get the roof replaced or fixed?
15 A  No.
16 Q  So when they came out to look at it, they said the
17    roof was fine?
18 A  Yes.
19 Q  Now, I saw that there's a judgment against
20    Ms. Grandy for $1,700 or $1,707.  Does that sound
21    right to you?
22 A  Yes.
23 Q  And I assume that includes a filing fee and --
24 A  Yes.
25 Q  -- and service fee?

**Page 59**

1 A  Yes.
2 Q  Do you know what portion of that includes costs
3    for repairs?
4 A  Basically all of it, because he didn't give me all
5    of the -- what I was asking for, because they had
6    certain documents. *I didn't have*
7 Q  He didn't give you the total damages?
8 A  Yes.
9 Q  Because you didn't have the receipts or something?
10 A  Receipts and different stuff.
11 Q  How much were you asking for?
12 A  I think I was asking for, like, 2,500.
13 Q  In addition to property damage, did that include
14    any missed rent?
15 A  Yes.
16 Q  For what months?
17 A  It was, like, I think September, October or
18    something like that and then January.
19 Q  What about February?
20 A  January, yes, and February.
21 Q  Did she live there in February?
22 A  Yes.
23 Q  When did she move out?
24 A  The end of the month, January, February.
25 Q  The end of February?

**Page 60**

1 A  I'm trying to think.  She moved out on the 1st,
2    like four days before the fire.  She moved out on
3    the 1st.
4 Q  So it would have been March 1?
5 A  Yes.  She moved out on the 1st, March 1.
6 Q  So you were looking for rent for whatever she owed
7    prior to January and then January and February
8    rent?
9 A  Uh-huh.
10 Q  Yes?
11 A  Yes.
12 Q  And so that would have been 700 bucks; so 1400
13    plus 400 to 500, $1900, and then plus whatever
14    damages, so you're looking at over two grand in
15    stuff that you were asking for?
16 A  Yes.
17 Q  And he gave you 1,700?
18 A  Yeah.
19 Q  What damages aside from lost rent or, you know,
20    rent she didn't pay were you trying to get?
21 A  She had some holes in the wall, and I had to redo
22    some plumbing in the bathroom, and she tore up a
23    lot of doors in the house.
24 Q  Was she angry?
25 A  This stuff was tore up before the eviction even

**Page 61**

1    started happening.
2 Q  But this was -- none of this was like this before
3    she moved in?
4 A  No.
5 Q  So how many holes were in the walls?
6 A  I don't know.  About four or five.
7 Q  Like big holes --
8 A  Yeah.
9 Q  -- or fist-size holes?
10 A  Like big holes.
11 Q  Like a foot in diameter?
12 A  Big holes.
13 Q  You're holding your hands probably about 18 inches
14    apart.
15 A  Yeah.
16 Q  You said there were four or five of those?
17 A  Yeah.
18 Q  You said you had to redo some plumbing in the
19    bathroom.  Did she screw that up?
20 A  Yes.
21 Q  What happened?
22 A  I don't know.  She messed up the sink.
23 Q  What did she do to it?
24 A  It was, like, leaking.  And it was, like, off the
25    wall.

Case 2:18-cv-00539-NJ    Filed 04/11/18    Page 16 of 42    Document 10-3

EXHIBIT C

Page 62

1  Q   The sink was off the wall?
2  A   Yeah.
3  Q   When you walked in there, were you like, "What
4      happened in here?"
5  A   Yeah.
6  Q   All right.  Did you have to get a plumber to come
7      in and do that, or did you do that yourself?
8  A   I did it myself.
9  Q   Did you just have to reattach the sink to the
10     wall?
11 A   I just went out and got another sink.
12 Q   You didn't have to replace any pipes or anything?
13 A   No.  Not really, no.
14 Q   How long did that take you?
15 A   About an hour and a half, two hours.
16 Q   What about all the holes in the walls?
17 A   How long did it take?
18 Q   Yeah.  How long did that take to fix?  I've never
19     done it, so I don't know?
20 A   It took some hours.  I had to cut it.
21 Q   You have to cut, like, a square and get another
22     piece of drywall?
23 A   Yeah.  Put it up, mud it, let it dry, mud it
24     again, sand it.  It took a while.
25 Q   Where were the holes?

Page 63

1  A   Bedroom.
2  Q   Upper or lower bedroom?
3  A   Both bedrooms, upper and lower.
4  Q   Anywhere else besides the bedrooms?
5  A   No.
6  Q   So --
7  A   I think there was one in the bathroom, too.
8  Q   And that's on the first floor, right?
9  A   Yes.
10 Q   Were there multiple holes in the bedrooms?
11 A   Yes.
12 Q   And was that, like, a multi-day thing, where
13     you've got to cut it out, put stuff on it, let it
14     dry --
15 A   Yes.
16 Q   -- come back, add other coats?
17 A   Yes.
18 Q   So how many days does it take to fix these holes?
19 A   It took two days.
20 Q   And you said she tore up doors.  Can you explain
21     that to me; interior doors, exterior doors?
22 A   Interior doors.
23 Q   Were there just holes in them?
24 A   Some had holes in it, like she locked herself out
25     and, like, she kicked it or something.

Page 64

1  Q   Was it damage to the doors or also damage to the
2      framing?
3  A   The framing a little bit too, yes.
4  Q   So you had to replace doors and redo the framing?
5  A   Yes.
6  Q   And you did all this work yourself?
7  A   No.  I had somebody helping me.
8  Q   Who did you have helping you?
9  A   What's their names?  I had a guy named Lorenzo and
10     two other people.  I can't remember their names
11     right off the top.  Lorenzo and Orlando and --
12 Q   Orlando like the city?
13 A   Yeah.  And --
14 Q   Or Bloom?  Take your pick.
15 A   I can't remember the other guy's name, because
16     that was one of their friends.  I didn't really
17     know him.
18 Q   Lorenzo and Orlando, are these people you work
19     with regularly?
20 A   Yes.
21 Q   Do you still have contact with them to this day?
22 A   Yes.
23 Q   Do you know their phone numbers?
24 A   414 --
25 Q   This is Lorenzo?

Page 65

1  A   Yes -- 975-7731.
2  Q   Orlando?
3  A   414-551-5922.
4  Q   And you said they do work with you regularly?
5  A   Yeah, here and there when I need something.
6  Q   And you paid them for working on this property?
7  A   Yes.
8  Q   Do you know how much you paid them, approximately,
9      or if you don't know, it's fine.
10 A   I don't know.  Probably like -- probably like --
11     close to, like, a thousand dollars or something.
12 Q   Each or together?
13 A   Together, because I painted the whole thing, fixed
14     the holes, just did a lot of stuff.
15 Q   So you fixed the four or five holes, replaced the
16     sink.  Where did you get the sink, the new one?
17 A   I had one already.
18 Q   You replaced the sink.  And how many doors did you
19     have to replace?
20 A   Like three, three or four.
21 Q   Do you know how many doorjambs or frames?
22 A   Just replaced one doorjamb.
23 Q   Where did you buy the doors?
24 A   I had bought them at Home Depot.
25 Q   Did you pay cash, use your credit card, debit

EXHIBIT C

Page 66

1  card?
2  A  I think I used cash.
3  Q  Do you keep receipts for stuff like that?
4  A  Sometimes. I try to.
5  Q  Do you know if you have any for any of the repairs
6     you had to do from Ms. Grandy?
7  A  No, because I had the receipts in the house while
8     I was fixing it and all the stuff and my tools,
9     and then the house caught fire.
10 Q  So did you have tools and stuff inside the house
11    when it caught fire?
12 A  Yes.
13 Q  You said she moved out on the 1st, and I'll get to
14    the tools in a second, you said she moved out on
15    the 1st, do you know approximately when?
16 A  Around about, what time?
17 Q  Well, were you standing out there when she was
18    moving out?
19 A  Yes.
20 Q  Were the police there as well, like a sheriff?
21 A  They came the first time. They came on, like, the
22    24th or 25th to put her out, but then she didn't
23    have nowhere to go, so being a nice guy, I let her
24    stay until the 1st, and then she moved out.
25 Q  How was your relationship with her? Was she

Page 67

1  angry?
2  A  She's angry.
3  Q  Why is she angry with you?
4  A  I don't know. I'm like, "I still let you stay
5     until the 1st. I didn't just kick you out on the
6     street, and you're still mad at me?" She was
7     cussing me out.
8  Q  So you're there when she's moving out on Sunday
9     or -- is that a Sunday?
10 A  I guess that was Sunday.
11 Q  Do you know when she was out?
12 A  She was out by 12:00, 1:00, somewhere in there.
13 Q  And did she have anybody helping move her out?
14 A  Yes. She had a few people helping move her out.
15 Q  And did she leave any stuff behind?
16 A  No, I had put everything that she — yeah, she
17    left stuff behind but she said she didn't want it,
18    so I moved everything out and put it on the curb.
19 Q  What did she leave behind?
20 A  Old furniture, a lot of different crap.
21 Q  Did she leave a lot of stuff behind?
22 A  Yeah.
23 Q  Did you try to get a small claims judgment for the
24    amount of work you had to do to put that stuff --
25 A  Yes.

Page 68

1  Q  Did you itemize the hours it took for you to move
2     all that stuff out?
3  A  No. I didn't do that.
4  Q  Because I imagine if you're trying to get paid for
5     having to move all that stuff out, you'd have to
6     say how long it took and charge a reasonable rate
7     to do it.
8  A  Yeah.
9  Q  You didn't try to seek that money?
10 A  No.
11 Q  What did she leave? You said "old furniture."
12    Was it beds, dressers, all of that?
13 A  Yeah, different stuff like that.
14 Q  You moved all that stuff out?
15 A  Me and the guys moved it out.
16 Q  Now, when did you do that?
17 A  Right after she left, because I started working on
18    it right then and there, cleaning everything up
19    and started working on it.
20 Q  How long did it take to get all her junk out of
21    there? I assume it's junk.
22 A  About an hour.
23 Q  Did you replace the locks after she left?
24 A  Yes.
25 Q  Was it that same day?

Page 69

1  A  Uh-huh.
2  Q  Yes?
3  A  Yes. Yes.
4  Q  Did you have locks with you when she was moving
5     out anticipating replacing them when she left?
6  A  Yes. When the sheriff came by, I let her keep her
7     stuff in the house until the 1st of the month, but
8     when she left, I replaced the locks then.
9  Q  Okay. So you replaced the locks prior to the 1st?
10 A  Yeah. I replaced them already.
11 Q  So she had no access to the property for, like, a
12    week?
13 A  Yes.
14 Q  Did anybody else have keys to these locks?
15 A  No.
16 Q  At the time the fire happened, did anybody else
17    have keys to these locks?
18 A  No.
19 Q  When she moved out on the 1st, was there any sign
20    of forced entry into the house, like a broken
21    window or smashed-in door or anything like that,
22    like her trying to get in?
23 A  Not -- not -- I didn't really check. I don't
24    know.
25 Q  Well, when you went there, you -- you had to go

EXHIBIT C

1   there when she moved out to let her in, right?
2  A  Yes.
3  Q  Now, did you unlock the front door?
4  A  The front door.
5  Q  Did you check the back door at all?
6  A  No, not really. I don't think I did, no.
7  Q  I guess, when you left the property that day after
8     she moved out, did you make sure it was all locked
9     up?
10 A  Yes, I did.
11 Q  You checked the front door, back door?
12 A  Yes.
13    Made sure the windows were closed, and locked? I
14    guess that's the important part.
15 A  Uh-huh.
16 Q  Yes?
17 A  Yes.
18 Q  All right. So you repainted the whole house. Did
19    you have to do the carpet as well after she moved
20    out?
21 A  Yes.
22 Q  So you did the carpet once before she moved in and
23    again after she moved out?
24 A  Yes, because she had it soiled so bad. It was
25    messed up. I don't know.

1  Q  What color was the carpet you had to replace?
2  A  Brown. I went back to brown, like a tan, brown.
3  Q  And where was carpeting inside of the house? Was
4     it the first floor, stairs, second floor?
5  A  All through the house, but I replaced the living
6     room.
7  Q  Only the living room?
8  A  Yes.
9  Q  Did you do that yourself?
10 A  Uh-huh.
11 Q  How long did that take?
12 A  About an hour or two.
13 Q  All right. So you did the bathroom sink, holes in
14    the walls, carpet, repainted the entire interior
15    of the house.
16 A  Uh-huh.
17 Q  Anything else?
18 A  No. I didn't do no other paint anywhere.
19 Q  Is that all the damages you sought in the small
20    claims case?
21 A  Yes.
22 Q  All right. When did you have all this work
23    completed?
24 A  I completed it the 3rd. We were working the 1st,
25    long hours, the 2nd, the 3rd, and then I had

1     people asking about the house because it was the
2     1st of the month and everybody wanted to move,
3     find a house to move into, so I was hurrying it.
4  Q  So the 1st of January is a Sunday, and you said
5     you had it done by the 3rd, which would have been
6     Tuesday.
7        MR. KRILL: January or --
8        MR. RYAN: Oh, no. March. I'm sorry.
9     I'm looking at a January calendar. I'd have to
10    pull out my calendar, which I have here.
11 BY MR. RYAN:
12 Q  The 1st is a Wednesday, and then the 3rd is a
13    Friday. So she moves out at noon on the 1st,
14    right?
15 A  Yes.
16 Q  And then you do all this work on the 1st, 2nd and
17    3rd.
18 A  Yes.
19 Q  With those other two individuals.
20 A  Yes.
21 Q  And did you have anybody else -- strike that. You
22    said you had a lot of people calling you about the
23    place?
24 A  Yes.
25 Q  Who did you have calling you?

1  A  I don't know. They were just calling me, because
2     I have an ad in a book.
3  Q  Where did you have an ad?
4  A  In the book, the blue book.
5  Q  Is it, like, a physical book?
6  A  Yes, a physical book.
7  Q  Was it, like, handed out in the mail?
8  A  No. They have them at stores, different stores
9     and stuff.
10 Q  Okay. And you had an ad for this place?
11 A  I keep the ad in the book all the time.
12 Q  So the ad doesn't specify an address?
13 A  No.
14 Q  Did you ever have anybody else lined up -- did you
15    have anybody lined up that was interested in this
16    particular property?
17       MR. KRILL: Objection, form of the
18    question. What time frame are you talking about?
19    Subject to that objection, go ahead and answer.
20       THE WITNESS: Yes. Several people
21    called, so I was telling them, "I have a house
22    that will be ready on the 3rd."
23 BY MR. RYAN:
24 Q  Did you show it to anybody?
25 A  I think I showed it to one other person.

EXHIBIT C

Page 74

1  Q   Who did you show it to?
2  A   I don't know their name.
3  Q   Did you show it to only one person?
4  A   I showed it to one other person besides the person
5      who came with the money that next day.
6  Q   And that was?
7  A   Jennifer.
8  Q   Jennifer?
9  A   Yes.
10 Q   So you showed it to Jennifer, and her last name is
11     Williams?
12 A   Yes.
13 Q   And you think you showed it to one other person?
14 A   Yes.
15 Q   Are you certain you did?
16 A   Yeah. I for sure did.
17 Q   When did you show it to Ms. Williams?
18 A   That night. Was it the 2nd? Yeah. I showed it
19     to her on the 2nd. Then on the 3rd, she gave me
20     the money order.
21 Q   So you showed it to Ms. Williams on the 2nd, the
22     day after Ms. Grandy --
23 A   Yes.
24 Q   -- moved out.
25 A   Yes.

Page 75

1  Q   All right. Do you know what time you showed it to
2      her on the 2nd?
3  A   It was sort of late.
4  Q   Was it after dark?
5  A   Yes.
6  Q   And how is it that you came into contact with
7      Ms. Williams?
8  A   Through a friend of mine. I knew this guy.
9  Q   What's the name of that person?
10 A   I don't -- I think his name is Terrance. I just
11     know him as "T-bone." I think his name is
12     Terrance, though.
13     (Exhibit No. 3 was marked.)
14 BY MR. RYAN:
15 Q   I just marked as Exhibit 3 a rental agreement.
16     We'll get to it in a minute. Had you known
17     Ms. Williams prior to her calling about this
18     place?
19 A   No.
20 Q   Did you have any mutual contacts other than
21     Terrance, or T-bone?
22 A   After I found out who she was or whatever, I
23     somewhat know her mother. I figured it out, that
24     I somewhat know her mother.
25 Q   What's her mother's name?

Page 76

1  A   I don't know her name. I just know her by face,
2      like.
3  Q   How do you know her mother?
4  A   Just frequent the same places and stuff like that.
5  Q   Which places?
6  A   Like different clubs or, you know, throughout the
7      years, seeing her here and there.
8  Q   All right. So you just know her mother by what
9      she looks like?
10 A   Yeah. No. "Hey, how you doing?" We cross paths
11     a lot here and there.
12 Q   How is it that you came to find out that you
13     somewhat know her mother?
14 A   I had seen -- she was -- I seen her and her mother
15     together one day.
16 Q   Where was that?
17 A   Where was that? At -- where was that? I think it
18     was riding through traffic somewhere. I was
19     supposed to meet her to do something, and then her
20     mother was with her. I don't really know right
21     exactly where it was at. It was, like, in traffic
22     somewhere.
23 Q   So you were in a car and they were in a car?
24 A   Yeah. I was supposed to meet her somewhere or
25     something.

Page 77

1  Q   You were supposed to meet who somewhere?
2  A   Jennifer.
3  Q   What were you supposed to meet Jennifer for?
4  A   For the remainder of the money.
5  Q   Security deposit?
6  A   The security deposit, yes.
7  Q   When was that?
8  A   It was, like, later on during the week.
9  Q   The week of the 1st?
10 A   No. She was supposed to rent that house, and
11     since that house burnt down, I had to rent her
12     another house.
13 Q   Does she live in one of your current properties?
14 A   Yes.
15 Q   What property does she live in?
16 A   24th Place.
17 Q   Did you talk to her at all, between the time of
18     this fire and as you sit here today, about the
19     fire or any of these facts at all?
20 A   I talked to her about the fire, because she was
21     like, "What happened to the house?" And I told
22     her that the fire inspector said it was an
23     electric problem, because she really liked that
24     house.
25 Q   Do you know if she had any contact with State Farm

BROWN & JONES REPORTING, INC.
414-224-9533

**Page 78**

1  between the time of the fire and the time we sit
2  here today?
3  A  For sure she did, because State Farm called me to
4     get her information.
5  Q  Do you know if State Farm had any contact with her
6     after you gave State Farm her information?
7  A  I don't know. I'm not for sure. I don't think
8     so.
9  Q  Did you ever talk with her about it?
10 A  No. Not really, no. I'm trying to think. I
11    can't remember offhand.
12 Q  Do you know if she gave a statement to State Farm?
13 A  For sure she did because they were calling for her
14    phone number.
15 Q  Did you ever talk with her about the statement she
16    gave to State Farm?
17 A  I know they were calling for her and they were
18    missing each other, so I don't know if they
19    actually caught up with each other or whatever
20    they did.
21 Q  The question is, did you ever talk to her about
22    the substance of what she said during her
23    statement to State Farm?
24 A  Oh, no.
25 Q  You're uncertain whether or not she even gave a

**Page 79**

1  statement to State Farm.
2  A  I don't know for sure.
3  Q  And you said you showed her the property on the
4     night of the 2nd after dark, correct?
5  A  Yes.
6  Q  Now, between the time Ms. Grandy moved out and the
7     night of the 2nd, what work had you done on the
8     property?
9  A  I had started right away, as soon as I moved her
10    out. I started taking the doors down and --
11       MR. KRILL: I'm just going to object to
12    the form of the question. It's been asked and
13    answered. He went through in detail as to what
14    work he did.
15       MR. RYAN: This isn't statutorily a
16    controlled deposition.
17       MR. KRILL: I understand.
18       MR. RYAN: Objections are essentially
19    meaningless.
20       MR. KRILL: Sure.
21       MR. RYAN: I'm going to ask the question
22    again, just letting you know, because it's
23    contractual.
24       MR. KRILL: I know. I just made an
25    objection for the record.

**Page 80**

1  BY MR. RYAN:
2  Q  What I want to know is, between the time that
3     Ms. Grandy moved out at noon on the 1st and the
4     time you showed the property on the night of the
5     2nd, what work had you completed? And then my
6     follow-up question to that is going to be, what
7     work still needed to be done?
8  A  I don't really know what all work I completed. We
9     had started taking doors down and --
10 Q  Why don't we do it this way? What work did you
11    finish the day after she moved out?
12 A  I can't really say. I know I patched some holes,
13    and we were doing stuff. So I know by the 3rd,
14    because we were working long shifts, all the way
15    until, like, nine, ten at night both days, all
16    three days. So we finally got it done, like, ten
17    o'clock the night of the 3rd.
18 Q  Was everything done?
19 A  Yeah. We'd just finished painting, and everything
20    was basically done.
21 Q  So you don't know what, if anything, you completed
22    on day one?
23 A  No, not really. I know I patched some holes and
24    took doors -- I know was breaking stuff down and
25    patching holes, took doors down, took the carpet

**Page 81**

1  up.
2  Q  So you patched holes, took the doors down, ripped
3     the carpet out.
4  A  Yeah.
5  Q  Do you know if you did the sink on the first day?
6  A  No. I don't think I did the sink on the first
7     day.
8  Q  What about painting the interior?
9  A  The interior, I did that -- we did that the last
10    day.
11 Q  So that would have been on the 3rd?
12 A  Yes.
13 Q  All right. Now, on the second day, do you know if
14    you had patched all the holes?
15 A  Yes. Most likely I patched all the holes.
16 Q  Do you know for sure one way or the other?
17 A  Yes, I did.
18 Q  So by the time that Ms. Williams saw the property,
19    were all the holes patched?
20 A  Yep.
21 Q  Was the sink replaced when she saw the property?
22 A  I don't know.
23 Q  The place wasn't painted, you said. It was done
24    the following day?
25 A  It was done on the 3rd. I did all that on the

EXHIBIT C

**Page 82**

1     3rd. All the paint was done on the 3rd.
2 Q  What about the carpet?
3 A  That was done on the 3rd, too.
4 Q  So you did the carpet on the 3rd as well?
5 A  Yes.
6 Q  So you did the carpet and painting on the 3rd.
7 A  The 3rd.
8 Q  You don't know if you did the sink on the 2nd?
9 A  I don't know. I think I did that on the 2nd. I
10     think I did that on the 2nd, too, late that night.
11     That was probably the last thing I did.
12 Q  On the 2nd?
13 A  Yes.
14 Q  Do you know if it was before or after Ms. Grandy
15     saw it?
16 A  I don't know.
17         MR. KRILL: Ms. Grandy or --
18         MR. RYAN: Ms. Williams. I'm sorry.
19         THE WITNESS: I don't know.
20 BY MR. RYAN:
21 Q  Maybe this is an easier question. Do you recall
22     what problems there were with the house, if any,
23     when Ms. Williams saw it? It still needed carpet,
24     still needed painting?
25 A  Painting.

**Page 83**

1 Q  Anything else?
2 A  That's about what was going on. I don't know. I
3     can't keep track of all that. I wasn't paying no
4     attention to that.
5 Q  I'm just asking to the best of your recollection.
6 A  I don't really know. When I'm working, I ain't
7     keeping up on who's there at this time and what's
8     fixed. I don't know.
9 Q  But you know you did the carpet and painting on
10     the third day.
11 A  Yeah, because I didn't want to paint --
12 Q  Probably wanted to paint before you did the
13     carpet.
14 A  Yeah. That's what I was saying.
15 Q  All right. When did Ms. Williams, you know, say,
16     "Yeah, I'm going to rent this place"? Do you want
17     to take a break?
18 A  Yeah. I have to use the bathroom. She said that
19     on the 2nd. I told her, "I'll have it ready by
20     the 3rd or the 4th," a couple days.
21 Q  All right.
22 A  And then she came with the money order sometime,
23     like, the 3rd or something, one of them days.
24         MR. RYAN: Do you want to take a break
25     and use the bathroom?

**Page 84**

1         THE WITNESS: Yes.
2     (Recess taken.)
3 BY MR. RYAN:
4 Q  Did she pay you -- she looked at it on the 2nd,
5     right?
6 A  Uh-huh.
7 Q  Yes?
8 A  Yes.
9 Q  When did you do the whole lease transaction and
10     exchange money?
11 A  That was on the 3rd.
12 Q  And where did you do that?
13 A  At her job.
14 Q  And where is her job?
15 A  37th and Villard. It's a day care.
16 Q  And I assume you went and met her there?
17 A  Yes.
18 Q  What time was that?
19 A  I can't really say. I can't really -- I forgot
20     what time.
21 Q  Like, day? Night?
22 A  It was, like, evening time or something.
23 Q  Does she work, like, second or third shift?
24 A  I think so, yeah.
25 Q  Had you completed the renovation of the property

**Page 85**

1     by the time she signed the lease?
2 A  No. I was getting done with it on the 3rd, that
3     night, so I just stayed all the way until about
4     ten o'clock that night.
5 Q  All right. You saw her before you left?
6 A  Yeah.
7 Q  Do you know -- strike that. Do you know what time
8     you got to the 13th Street property on the 3rd to
9     continue working on it?
10 A  No. I wasn't keeping track of time.
11 Q  Did you go there before you went and met
12     Ms. Williams to sign the lease and get the money?
13 A  Yes. I was there early in the morning.
14 Q  So you were working there during the day. At some
15     point you left and met with her and then came back
16     to the property to continue working?
17 A  Yes.
18 Q  And you think that somewhere around the evening
19     time you left?
20 A  Yes.
21 Q  Was it dark out or getting there?
22 A  It was getting there, because it's wintertime, so
23     it was getting dark early.
24 Q  When she came to see the property, did you still
25     have tools and stuff inside the house?

BROWN & JONES REPORTING, INC.
414-224-9533

EXHIBIT C

1  A   Yes. I was working on the house.
2  Q   Do you know what you had in there when she saw it?
3  A   Not really.
4  Q   What did you have in there after you left on
5      the 3rd?
6  A   I still had a couple ladders, drills, a saw,
7      painting stuff, painting materials and stuff.
8  Q   Did the electricity work inside the house?
9  A   Yes.
10 Q   I assume if it didn't, you'd be having some words
11     with the guy you paid to redo it.
12 A   Uh-huh.
13 Q   All right. Now, where did you keep the tools, or
14     where were they inside the house, if you know,
15     when you --
16 A   They were in the kitchen.
17 Q   For the record, to specify -- on the 3rd after you
18     left when you were done doing all repairs?
19 A   They were in the kitchen.
20 Q   So you had ladders, drills, saw, painting stuff,
21     and all this stuff was in the kitchen?
22 A   The kitchen, yes. I think some stuff was in
23     different places, but the majority of the stuff
24     was in the kitchen.
25 Q   Is that true, if you know, of all the stuff being

1      in the kitchen when Ms. Williams looked at the
2      property the day before?
3  A   No. We started working when she left so stuff was
4      everywhere.
5  Q   Did you have to rent any tools to do any of the
6      work?
7  A   Rent, no.
8  Q   You didn't have to rent any tools to lay the
9      carpet?
10 A   No.
11 Q   To stretch the carpet?
12 A   No. I have all that stuff.
13 Q   The saw, is that, like, a table saw?
14 A   No. It was a hand saw.
15 Q   Like a circular saw?
16 A   Circular saw.
17 Q   All right. You met her on the 3rd sometime around
18     when it was getting dark, and you signed the
19     lease, and she gave you money, is that right?
20 A   Yes.
21 Q   So I've marked Exhibit 3. Is this a copy of the
22     lease you signed with Ms. Williams?
23 A   I guess so, yes.
24 Q   Well, flip it over to the second page. Is that
25     your signature at the bottom?

1  A   That's my signature.
2  Q   Did you see Ms. Williams sign her signature?
3  A   Yes.
4  Q   And is that the signature she signed?
5  A   Yes.
6  Q   And then did she pay you at the time you signed
7      the lease?
8  A   Yes.
9  Q   And how did she pay you?
10 A   With a money order.
11 Q   And how much was it?
12 A   A thousand dollars.
13 Q   How much were you charging her rent?
14 A   I was charging her -- I think I was charging her
15     $900 a month.
16 Q   Do you know why she wrote you a money order for
17     $1,000?
18 A   Because she didn't get her other check yet or
19     something.
20 Q   All right. So she was to pay you the rest of
21     it --
22 A   Yes.
23 Q   When?
24 A   A couple of days. That's when I'd probably seen
25     her and her mother when she was -- when I caught

1      up with her.
2  Q   So were you meeting up with her to get the rest of
3      the money?
4  A   Yes.
5  Q   And do you know when that was?
6  A   That was like a week or so afterwards.
7  Q   How much did she pay you a week or so afterwards?
8  A   The other house I moved her to, the rent was
9      cheaper because it's a duplex, so I told her to
10     just give me, like, 200 more dollars, two or
11     three.
12 Q   How did she pay you the second time?
13 A   She paid cash.
14 Q   And did you deposit that cash into a bank account?
15 A   I don't know what I did.
16 Q   The money order I assume you must have deposited
17     into a bank account?
18 A   Yes.
19 Q   Do you know when you did that?
20 A   I didn't do it right away, because the house had
21     caught fire, so I didn't know what she was going
22     to do, so she asked, did I have another house, and
23     I told her "yeah."
24 Q   Did you talk to her about depositing it before you
25     deposited it?

EXHIBIT C

Page 90

1   A   Yeah. I talked to her, yeah.
2   Q   And the date of the money order, is it dated the
3      3rd, if you remember?
4   A   Yes. It's dated the 3rd.
5   Q   Can you get a copy of it?
6   A   I gave you copies of everything.
7   Q   Of her money order?
8   A   Yes.
9   Q   I have a copy of a receipt written by you for the
10     money order. It's just a handwritten receipt.
11   A   No.
12        THE WITNESS: I gave you a copy of the
13     money order too, didn't I?
14        MR. KRILL: I have no idea.
15 BY MR. RYAN:
16   Q   That is what I have.
17   A   I think it was a one thing, money order that
18     you --
19   Q   Go ahead.
20   A   I think it was one piece of money order that had
21     no receipt to it. I think it was just one thing.
22   Q   You have to sign it and give it to the bank,
23     right?
24   A   Yeah.
25   Q   So typically, at least in my experience, if you go

Page 91

1     to a bank and show them a transaction and -- say,
2     if you cash a check and you say, "Can I get a copy
3     of this check," they'll be able to print it out
4     and give it to you.
5   A   I didn't ask for a copy.
6   Q   That's what I'm saying. Can you get that for me?
7   A   I would have to see. I don't think I'd be able to
8     get it, because they changed branches now. I had
9     a hard time even getting statements.
10   Q   Otherwise, I can get an authorization and I can
11     try to get it myself.
12   A   Yeah. That would be better.
13   Q   This is what I'm looking at. It looks like a
14     deposit for a thousand dollars. Is that her
15     security deposit?
16   A   Yeah. Is that the month?
17   Q   It's March 6.
18   A   That might be it, yeah.
19   Q   Okay. So, I mean, if you walked in there with
20     this and said, "I want," you know --
21   A   I understand what you're saying, but I had a hard
22     time even getting my statements after they
23     switched over. I couldn't -- they wouldn't even
24     give me my statements.
25   Q   It's now Self-Help, right?

Page 92

1   A   Yeah.
2   Q   And this was after the switchover, right?
3   A   Yes.
4   Q   So hopefully they still keep records.
5   A   I'll leave you up to that because I had a hell of
6     a time getting that.
7   Q   All right. Now, who filled out the lease that's
8     marked as Exhibit 3?
9   A   I did.
10   Q   And so you wrote in here, "Cut the grass, remove
11     debris," et cetera?
12   A   Yeah.
13   Q   And it looks like it's a 12-month lease beginning
14     on 3-3-17 and going to 3-3-18.
15   A   Yes.
16   Q   Now, did you communicate that to her, the term of
17     the lease?
18   A   Yes. I think we discussed it, yes. I'm sure we
19     did.
20   Q   That's something you usually discuss with your
21     tenants, whether or not it's going to be a
22     month-to-month or 12-month lease?
23   A   Yes. I'm sure we did.
24   Q   If she thinks it's a month-to-month lease --
25   A   I'm not for sure we did. I don't know what we

Page 93

1     discussed. We were moving fast and trying to get
2     the house done before she could move in the next
3     day, so I don't know what we discussed. Whether I
4     for sure did, I don't know.
5   Q   Did you give her keys?
6   A   At that time, no. I don't think I gave her keys
7     at that time. I think she was going to come get
8     them in the morning the next day, because I was
9     still working on the house.
10   Q   So you still had a bunch of stuff in the house?
11   A   Yes.
12   Q   When were you planning on getting that out?
13   A   The next day.
14   Q   And were you going to meet her at the house to
15     give her keys at the same time?
16   A   Yes. I think so.
17   Q   I thought I printed extra copies of both your
18     statements to mark as exhibits. I was almost
19     certain I did. Here they are.
20        I'm going to mark Ms. Williams'
21     statement as Exhibit 4 and read to you and with
22     you some portions of it, if you could turn to
23     page 6. I'm looking at line 165. Tell me when
24     you're there.
25   A   Line 165?

Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 24 of 42   Document 10-3   EXHIBIT C

**Page 94**

1  Q  The question is, "And you said it was freshly
2      painted and there was new carpet?" Answer, "Yup."
3      Question, "Was there any debris or stuff laying
4      around there from the last tenant when you looked
5      at it?" Answer, "No. Not when I looked at it."
6      Question, "Okay. It was all cleaned up and ready
7      to move in?" Answer, "Yes." Did I read that
8      right?
9  A  Uh-huh.
10  Q  Yes?
11  A  Yeah. Yes. Yes, you did.
12  Q  Now, I guess the question I have is, if she looked
13      at it on the 2nd and you say you didn't put carpet
14      in until the 3rd and you didn't paint it until the
15      3rd and you still had all your tools laying around
16      on the 3rd, how is it that she's saying that none
17      of that happened?
18  A  She didn't say none of it happened. I told you
19      that she came on the 2nd, and then she came on the
20      3rd, too.
21  Q  She came on the 3rd as well?
22  A  Yes. She came both days.
23  Q  When did she come on the 3rd?
24  A  Around about eight.
25  Q  At night?

**Page 95**

1  A  Yes, seeing how far I was on it.
2  Q  This is after you signed the lease?
3  A  Yes. This is after. I think she signed the lease
4      at, like, four or five. It was dark, but it was,
5      like, four or five.
6  Q  I guess my question would be, why are you going to
7      her work to sign the lease if she's coming over
8      after?
9  A  She wanted to see it afterwards. She wanted to
10     see how far I got. I talked to her when she
11     signed the lease, and I said, "I'm almost done.
12     You can come see it when you get off work," or
13     whatever.
14  Q  Now, if you look at page 4, line 105, "Do you
15     recall when you looked at the house?" Answer,
16     "I'm kind of positive it was the 2nd. I'm almost
17     for certain that it was the 2nd."
18  A  Okay.
19  Q  Did I read that right?
20  A  Yeah.
21  Q  She doesn't mention the 3rd, does she?
22  A  No, but he just asked her -- he didn't ask her all
23     the days, though.
24  Q  So it's your testimony that she came on the 2nd,
25     looked at the house, and then the following day on

**Page 96**

1      the 3rd, you met her at her work?
2  A  Yeah.
3  Q  Signed the lease, got the thousand dollars, and
4      then she came again on the 3rd.
5  A  Yes, because I remember -- I think she almost got
6      some paint on her because I was painting.
7  Q  And then when she came on the 3rd, was the house
8      painted and the carpet installed?
9  A  Yes. The paint was still wet and the house -- we
10     started painting certain rooms, the upstairs, but
11     all the downstairs was basically painted and done,
12     and I think she almost got paint on her or
13     something. I don't know.
14  Q  Did you still have tools and items in the house
15     when she came in on the 3rd?
16  A  Yeah. Yeah. Everything was still there.
17  Q  Between the time she left on the 3rd -- which you
18     said was about 8:00?
19  A  Yeah, about eight, nine.
20  Q  -- and the time you left --
21  A  I left at ten.
22  Q  -- what work had you done?
23  A  When I left? What time are you talking about?
24  Q  Between the time she came on the 3rd and the time
25     you left on the 3rd, between eight and ten, what

**Page 97**

1      work did you do?
2  A  I was painting. We were still painting.
3  Q  Where were you painting?
4  A  Upstairs.
5  Q  Did you show her the upstairs when she came on the
6      3rd?
7  A  Yes. I don't know if she went upstairs, because
8     we were doing a lot of painting then. I don't
9     think she went upstairs. I don't know. I can't
10     remember.
11  Q  Did she go downstairs?
12  A  Yeah. She was downstairs. She came in and looked
13     downstairs. She seen we were almost done, so she
14     was good with that. I was telling her she could
15     move in tomorrow.
16  Q  And you said the paint downstairs was still
17     drying; she almost got some on her clothes?
18  A  Something like that, yeah.
19  Q  Is it, she almost got some on her clothes because
20     the paint on the walls were still wet?
21  A  Yes.
22  Q  Did you have the carpet installed?
23  A  Yeah. The carpet was installed.
24  Q  So you put the carpet in after you painted,
25     correct?

EXHIBIT C

**Page 98**

1  A   Yes.
2  Q   So between the time you painted the place, the
3      inside, and the time you put the carpet in, the
4      paint hadn't dried yet?
5  A   No.
6  Q   So you were able to install the carpet in the
7      living room after painting before the paint dried.
8  A   Uh-huh.
9  Q   Yes?
10 A   Yes.
11 Q   Did any of the tools that you had in there after
12     the 3rd, that you had left in there, did any of
13     them require the use of gasoline?
14 A   No.
15 Q   Did you have any gasoline in the house at all?
16 A   No.
17 Q   Did you have, to your knowledge, any fire
18     accelerant inside the house after you left on the
19     3rd?
20 A   I had paint remover.
21 Q   Do you know what it was?
22 A   I don't know what it was, what kind it was.
23 Q   Paint thinner?
24 A   Yes. Like paint thinner, yeah.
25 Q   What I mean is, was there a bottle of paint

**Page 99**

1      thinner, or what was it?
2  A   It was a can.
3  Q   Was there any paint thinner left inside of it?
4  A   Nope. I don't think so, no.
5  Q   It was empty?
6  A   Yeah.
7  Q   Had you used the paint thinner for anything?
8  A   To get paint off the woodwork.
9  Q   Specifically which woodwork?
10 A   Whatever woodwork had paint on it.
11 Q   So just, like, the molding and so forth?
12 A   Molding and different stuff like that, yes.
13 Q   And you used all of it?
14 A   No. It was from previous jobs so I had a little
15     left, so.
16 Q   All right. When did you take the paint off the
17     woodwork? Was it on the 3rd?
18 A   Yes. After we got done painting or whatever,
19     there was paint here and there. We just wiped it
20     up.
21 Q   You didn't use a lot of it?
22 A   No. Not really, no.
23 Q   The paint that you had to take off with the paint
24     thinner, was it dried paint?
25 A   Some of it. Some was old paint from previous

**Page 100**

1      paint, so we were cleaning everything up, making
2      it look real nice.
3  Q   Do you recall specifically anywhere you had to
4      take paint off with paint thinner?
5  A   Everywhere.
6  Q   In every single room?
7  A   Basically, because we were rushing the painting.
8      We were trying to get it done.
9  Q   Did everybody use paint thinner or just you?
10 A   Everybody used paint thinner.
11 Q   So you don't know specifically where it was used?
12 A   No.
13 Q   The bottle of paint thinner you said was empty by
14     the time you were done, right?
15 A   Uh-huh.
16 Q   Yes?
17 A   Yes.
18 Q   Was the empty bottle still in the house when you
19     left on the 3rd?
20 A   I don't know. I don't know if somebody — because
21     we were cleaning up as, you know, we got done, so
22     I don't know if somebody picked it up and set it
23     out or what. I don't know.
24 Q   Did you see the report drafted by Mr. Quick?
25 A   Uh-uh.

**Page 101**

1  Q   No?
2  A   No.
3  Q   I'm going to mark as Exhibit 5 a report dated
4      April 17, 2017, drafted by Michael P. Quick. I'm
5      going to show this to the witness. Have you ever
6      seen this report prior to sitting here today?
7  A   No.
8  Q   This was never sent to you?
9  A   I don't know. I can't remember. I don't think
10     so.
11 Q   If it was sent to you, you don't remember looking
12     at it.
13 A   If it was sent to me what?
14 Q   You don't remember looking at it.
15 A   I don't remember looking at it, no.
16 Q   On the last page of the report -- the pages aren't
17     numbered. Oh, they are. I apologize -- page 8,
18     "Laboratory Analysis," it says, "Great Lakes
19     Analytical, Inc., authored a laboratory report
20     stating gasoline was identified in the debris
21     sample collected from the second floor location."
22     Do you see that right here?
23 A   Okay. Yeah.
24 Q   I read that correctly?
25 A   Uh-huh.

EXHIBIT C

**Page 102**

1  Q   Yes?
2  A   Yes.
3  Q   Do you have any explanation as to why there would
4      be a positive test for gasoline?
5  A   I don't know.
6  Q   Were you aware of any gasoline inside the house?
7  A   No, I wasn't.
8  Q   When you left the night of the 3rd, you locked all
9      the doors behind you?
10 A   Yes.
11 Q   And you were the only one that had keys?
12 A   Yes.
13 Q   Do you have any explanation as to how this fire
14     started?
15 A   No, not right offhand, because I thought it was
16     electric. The fire department said it was
17     electric. Because at first, before the fire
18     department stated it was electric, I thought
19     Ms. Lillian had came and had somebody do something
20     to it, so I didn't know. And then they said it
21     was electric.
22         MR. RYAN: Could you read that back?
23         (Above answer was read.)
24 BY MR. RYAN:
25 Q   You thought Ms. Grandy did something?

**Page 103**

1  A   Yes.
2  Q   When did you think that?
3  A   When it was on fire.
4  Q   All right. When did you first learn of the fire?
5  A   The people next door called me and said that the
6      house was on fire.
7  Q   The neighbors called you?
8  A   Yes.
9  Q   Did you know the neighbors?
10 A   Yeah, from being over there fixing on the house,
11     and one of the young ladies wanted to rent the
12     house.
13 Q   Who called you?
14 A   I don't know her real name.
15 Q   Who does she go by?
16 A   Chi Chi.
17 Q   Chi Chi?
18 A   Yeah.
19 Q   Like the restaurant?
20 A   Yeah.
21 Q   Do you know her phone number?
22 A   No, not right now. I haven't talked to her
23     probably since then.
24 Q   Does she still live there, do you know?
25 A   I don't know.

**Page 104**

1  Q   Looking at the house, so I guess you'd be facing
2      west. The front of the house faces east, right?
3  A   The front of the house faces east, yes.
4  Q   All right. So looking at the house, is she on the
5      left side or the right side or across the street?
6  A   She's on the left side.
7  Q   Is it the very first house on the left side?
8  A   Very first house on the left side.
9  Q   So she would be the south neighbor?
10 A   Yeah, the south neighbor.
11 Q   Is that multiple units on the south?
12 A   No, a one-family house.
13 Q   How long have you known Chi Chi?
14 A   When I first started fixing the house over there,
15     that's when I first met her.
16 Q   Did you talk to the Milwaukee Fire Department at
17     all about this? Well, let me back up a little
18     bit. I'll ask you about the MFD in a second. You
19     said you first found out because Chi Chi called
20     you.
21 A   Yes.
22 Q   Do you know when that was?
23 A   Like 4:00, 4:30 in the morning, 5:00, somewhere in
24     there. I was asleep. I don't know.
25 Q   Do you know if the fire department had arrived by

**Page 105**

1      the time she called you?
2  A   Yeah. The fire department was already there.
3  Q   What did you do after she called you?
4  A   I came down and seen what was going on.
5  Q   Do you know what time you arrived at the scene?
6  A   No, not right offhand.
7  Q   What did you see when you arrived?
8  A   Fire trucks and fire.
9  Q   Did you see actual fire or just smoke?
10 A   Fire.
11 Q   Did you talk to any fire department or police or
12     anybody when you arrived?
13 A   I talked to the police.
14 Q   What was the nature of the conversation?
15 A   Well, what was going on, what happened, stuff like
16     that. Everybody said it was electric, because the
17     fire kept starting back, kept starting back, so
18     that's what they said, it was electric.
19 Q   All right. What did you say to the police?
20 A   The police was saying it might be electric because
21     the fire kept starting back, like, inside the
22     walls. They were like, "that must be electric."
23     And then the fire department said it was electric
24     so
25     that's — everybody said it was electric. I don't

1  know.
2  Q  Do you know the name of the officer you spoke
3     with?
4  A  No.  It was a female and a male.
5  Q  Did you ever speak with the fire department at
6     all?
7  A  At the end, they just asked me my name and stuff
8     like that, whatever.  It wasn't nothing.
9  Q  How long were you there?
10 A  Until they put it out.
11 Q  Do you know how long that was?
12 A  Probably until, like, six in the morning, seven in
13    the morning.
14 Q  And then did you just go back home?
15 A  Yeah.
16 Q  And I imagine get some sleep?
17 A  Yeah.
18 Q  All right.  The night before, you were working on
19    the house, you leave, and you meet with Jennifer
20    to go sign the lease.
21 A  Uh-huh.
22 Q  If you turn to her statement, which I think is
23    Exhibit 4 -- can you look at the front page and
24    tell me the exhibit number?
25 A  It's Exhibit 4.

1  Q  Turn to page 3, line 73.  Are you there?
2  A  Uh-huh.
3  Q  Yes?
4  A  Yes.
5  Q  And the question is, "Where were you that you
6     actually signed it?"  Answer, "Um he came to my
7     job, my second job, which is at a day care on 35th
8     and Villard."  Question, "Okay."  Answer, "I was
9     on my lunch break and he um, you know, like as you
10    know, I am very busy so he had to kind of catch me
11    there."  I don't know when her lunch break is, but
12    if you saw her at 5:00ish --
13 A  Uh-huh.
14 Q  -- that would have had to have been when her lunch
15    break was?
16 A  I guess.  I can't tell you.
17 Q  You're certain it was about 5:00?
18 A  I don't know.  I couldn't tell you the time
19    because it gets dark early or whatever, so I don't
20    know.
21 Q  So it was the time, whenever it was getting dark.
22 A  Yeah.
23 Q  All right.  And then you signed the lease, go
24    back, finish up what you're doing.  Are the two
25    guys you have with you still there after you

1     signed the lease?
2  A  Yes.
3  Q  Did they stay there while you went to go sign the
4     lease?
5  A  Yes.  They stayed working.
6  Q  And then at some point afterwards, she came to the
7     house you said around, like, 8:00?
8  A  Eight, nine, after she got out of work, whatever
9     time that was.
10 Q  Okay.  Did she tell you she had just gotten off of
11    work?
12 A  I think so, yeah.  I knew she got off work because
13    I'd seen her earlier, so I knew she was at work.
14 Q  Or at least on a break.
15 A  A break, whatever.
16 Q  How long did she stay there?
17 A  She just came to see how far we were.  No more
18    than five, ten my minutes.
19 Q  And Lorenzo and Orlando were still there when she
20    arrived?
21 A  Yes.
22 Q  And then you finished up a couple hours later,
23    around ten?
24 A  Around ten, ten or eleven.
25 Q  And then were Lorenzo and Orlando with you at the

1     end of the day?
2  A  Yes.
3  Q  And then what happened after you were finished?
4     Did you clean up your tools?  Did you clean your
5     paint rollers?  What did you do?
6  A  I put the paint rollers in bags and then just put
7     the tools to the side or whatever.  And then
8     everybody was dog tired, so we were packing all
9     this stuff in the car, so we just put everything
10    to the side because the house was basically
11    cleaned up already.  We just left.
12 Q  And then you locked the front and back doors when
13    you left?
14 A  Yes.
15 Q  And you're certain you did that?
16 A  Yes.
17 Q  When you left, did you all have your separate cars
18    or did you ride together?
19 A  Everybody had separate cars.
20 Q  And then what did you do after you left?
21 A  I went home, took a hot shower and got ready to go
22    out.
23 Q  All right.  Where did you go out?
24 A  To Mr. J's.
25 Q  J-A-Y-'-S?

EXHIBIT C

1  A  Just "J."
2  Q  Did you go with anybody?
3  A  No.
4  Q  Did you meet anybody there you know?
5  A  No. I know a lot of people there.
6  Q  Just every night, there's people there you know?
7  A  Yeah.
8  Q  Anybody there you recall seeing?
9  A  A lot of people. I can't say right off the top
10     because I was drinking. I don't remember. The
11     night, like, is vague really.
12 Q  How long did you stay there?
13 A  Until close.
14 Q  So 2:00?
15 A  2:00, 2:30.
16 Q  Did you just go home afterwards?
17 A  No. I went and got something to eat. I'm for
18     sure I did. I think it was a sub place on Sherman
19     and Capitol.
20 Q  All right. Do you know what time you got home?
21 A  That's what I was saying, around three, a little
22     bit after three.
23 Q  And how, if you know, did Celia know you got home
24     around three?
25 A  Because she heard me come in.

1  Q  Did you talk to her at all?
2  A  No. She's somewhat of a light sleeper. She hears
3     when I come in.
4  Q  And do you live in a single-family house?
5  A  Duplex.
6  Q  And you two live in the same unit, right?
7  A  Yes.
8  Q  Who lives on the top and who lives on the bottom?
9     There's two floors, right?
10 A  Yes.
11 Q  You're in the downstairs?
12 A  Yes.
13 Q  So you got home at three. I guess you didn't get
14     very much sleep before you got woken up again.
15 A  No.
16 Q  Did you ever see the Milwaukee Fire Department
17     report?
18 A  Yes, I have. I gave it to my lawyer.
19 Q  Did you see that they had to breach the doors to
20     get in?
21 A  Yes.
22 Q  Given that there's freshly changed locks, you've
23     got the only keys, you locked everything up before
24     you left, no signs of forced entry, the Milwaukee
25     Fire Department had to break the doors to get in,

1     and then there's a presence of gasoline, given all
2     those facts, would you agree that State Farm has
3     obvious concerns about the legitimacy of this
4     claim?
5  A  I don't know why.
6  Q  Why not?
7  A  I said I don't know why they would have issues
8     with legitimacies about the claim. I haven't done
9     anything.
10 Q  Given the reasons I just set forth.
11 A  I know, but that's not real good reasons to me.
12 Q  So the fact that you're the only one that has
13     keys.
14 A  That doesn't mean nothing.
15 Q  The place was locked up when you left.
16 A  The person probably broke in, got in and locked
17     the doors, or they got through a window somehow.
18     I don't know.
19 Q  That's what I'm saying. There's no signs of
20     forced entry. How are they getting in? The doors
21     are locked and you've got the keys.
22 A  They could go through a window or anything, and
23     then when they leave out, lock the door.
24 Q  The windows were locked, right?
25 A  I thought for sure they were but I'm not for sure.

1  Q  I thought I asked you earlier if all the windows
2     were locked and you said "yes."
3  A  I said "yes," I for sure went through and locked
4     the doors, the back and the front door.
5  Q  So you're saying you don't know if the windows
6     were locked?
7  A  I don't know if all of them were locked but I know
8     for sure some of them were. I don't know if the
9     other person locked everything up, because they
10     were locking stuff up, too, so I don't really know
11     off the top. Really, I don't know if someone did
12     get in even. I don't know.
13 Q  All right. So you have no explanation whatsoever
14     as to how the fire happened or how someone would
15     have gotten in.
16 A  No.
17 Q  And you have no explanation as to the presence of
18     gasoline.
19 A  No.
20 Q  Do you know of anyone who would have a motive to
21     put gasoline in this property and start it on
22     fire?
23 A  The only person I said is Ms. Grandy, because she
24     was very upset when I evicted her.
25 Q  Did you ever talk to the police about that?

EXHIBIT C

**Page 114**

1  A   Yes. I said that to them that night, that
2      morning. But then they said it's electric, so I
3      didn't say anything after that, so I thought it
4      was electric.
5  Q   Is there any reason, other than the fact that
6      someone told you it was electric that morning, for
7      you to believe that there was an electrical fire?
8  A   No.
9  Q   And sitting here today, you have no idea the cause
10     of the fire?
11 A   No.
12         MR. RYAN:  All right. I'm going to take
13     a short break and we should be done soon.
14         (Exhibit No. 6 was marked.)
15 BY MR. RYAN:
16 Q   Just for the record, I'm marking Exhibit 6 so that
17     we all have it and are on the same page, which is
18     a copy of your statement, and then just a few
19     follow-up questions. What kind of paint were you
20     using?
21 A   I think it was Glidden or Behr. I don't know
22     which one it was.
23 Q   Do you know if it was latex paint, oil paint,
24     enamel?
25 A   Latex I think.

**Page 115**

1  Q   And did you clean your brushes and rollers off at
2      the end of the night?
3  A   No. We didn't clean them. I just wrapped them in
4      bags.
5  Q   Like wet paper bags?
6  A   Plastic bags.
7  Q   Eventually you cleaned them, right?
8  A   Yeah. Whenever I take them home, I clean them. I
9      didn't want to mess up the sink because we just
10     cleaned up.
11 Q   How do you clean them when you get home?
12 A   Basically water.
13         MR. RYAN:  Thanks for your time.
14         (Proceedings concluded at 2:42 p.m.)
15
16
17
18
19
20
21
22
23
24
25

**Page 116**

1   STATE OF WISCONSIN  )
                          ) SS:
2   COUNTY OF MILWAUKEE )
3
4
5           I, JODI L. TYLEY, a Registered
6   Professional Reporter and Notary Public in and for the
7   State of Wisconsin, do hereby certify that the above
8   deposition of CRAFTON MOORE was recorded by me on
9   August 25, 2017, and reduced to writing under my
10  personal direction.
11          I further certify that I am not a
12  relative or employee or attorney or counsel of any of
13  the parties, or a relative or employee of such attorney
14  or counsel, or financially interested directly or
15  indirectly in this action.
16          In witness whereof I have hereunder set
17  my hand and affixed my seal of office at Milwaukee,
18  Wisconsin, this 1st day of August, 2017.
19
20
21          _____
                    Notary Public
22             In and for the State of Wisconsin
23
24
My Commission Expires:  October 05, 2018.
25

**Page 117**

1   STATE OF WISCONSIN  )
                          ) SS:
2   COUNTY OF MILWAUKEE )
3
4           I, CRAFTON MOORE, do hereby certify that
5   I have read the foregoing transcript of proceedings,
6   taken on August 25, 2017, at Ryan Law Firm, LLC, 18000
7   West Sarah Lane, Brookfield, Wisconsin, and the same is
8   true and correct, except for the list of corrections
9   noted on the annexed page.
10
11          Dated at _____
12  this _____ day of _____, 2017.
13
14
15          _____
16                  CRAFTON MOORE
17
18  Subscribed and sworn to before me
19  this _____ day of _____ 201_
20
21
22  Notary Public
23
24  My Commission Expires:
25

EXHIBIT C

Page 118

1   CORRECTIONS
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

BROWN & JONES REPORTING, INC.
414-224-9533

Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 31 of 42   Document 10-3

EXHIBIT C

| Exhibits | 1 |
|---|---|
| **Moore 082517 Ex .1** | **1** 14:14,16,19 20:23 21:1,12,16, 19 55:6 60:4,5 |
| **Moore 082517 Ex .2** | **1,500** 32:12 34:5 |
| **Moore 082517 Ex .3** | **1,700** 60:17 |
| **Moore 082517 Ex .4** | **10** 13:16 21:8 |
| **Moore 082517 Ex .5** | **105** 95:14 |
| **Moore 082517 Ex .6** | **107th** 21:18 |
| | **10K** 49:5,6 |
| | **11-30-69** 8:18 |
| **$** | **12,000** 32:25 |
| **$1,000** 88:17 | **12-month** 92:13, 22 |
| **$1,400** 51:9 | **12:00** 67:12 |
| **$1,500** 46:3 48:2 | **13** 17:10 |
| **$1,700** 58:20 | **13,000** 32:25 |
| **$1,707** 58:20 | **13th** 20:6,13,20 43:21 45:8 48:15 85:8 |
| **$10** 16:5 26:21 | **14** 17:10 18:1 39:12 |
| **$10,000** 48:6 | **1400** 60:12 |
| **$16,500** 17:21 | **15** 18:7 32:18 45:3, 11,17 50:19 |
| **$19,903** 18:12 | **1500** 46:9 |
| **$1900** 60:13 | **16** 44:19,24 45:5, 12 50:23 53:20 56:1 |
| **$2,000** 46:3 | **165** 93:23,25 |
| **$200** 51:16,23 | **16th** 45:13 |
| **$3,000** 34:7 | **17** 44:25 54:24,25 101:4 |
| **$300** 30:17 | **18** 61:13 |
| **$400** 54:4 | **1999** 39:15 |
| **$5,000** 20:14 | **1:00** 67:12 |
| **$500** 54:4 | **1st** 60:1,3,5 66:13, 15,24 67:5 69:7,9, 19 71:24 72:2,4, 12,13,16 77:9 80:3 |
| **$60,000** 16:23 17:7 18:13 | |
| **$700** 51:2,7 | **2** |
| **$900** 88:15 | **2** 20:19 38:7,8 |
| **0** | |
| **07** 9:7,12,14 | |
| **09** 13:16 | |

| | 3-3-18 92:14 | 5 |
|---|---|---|
| **2,000** 32:12 | **30** 8:16 10:17 26:23 | **5** 21:1,4,12 22:17 101:3 |
| **2,500** 59:12 | **30,000** 15:2 23:2 | **5,000** 31:5 |
| **20** 8:16 41:19 | **30-year-old** 11:1 | **500** 30:1 60:13 |
| **20,000** 18:14 | **32nd** 21:15,23,24 | **5048** 21:15,23,24 |
| **20-plus** 8:15 | **35th** 107:7 | **5764** 22:5 |
| **200** 89:10 | **3723** 20:17,21 | **58** 23:21 |
| **2013** 10:4 16:17 17:13,15 18:13 26:9,11 36:10 | **37th** 20:15,16 21:1,11 27:2 32:16 84:15 | **5:00** 104:23 107:17 |
| **2014** 16:17 17:15, 22 18:10,13 23:11 31:7 32:18 36:11 | **3949** 8:14 22:22 | **5:00ish** 107:12 |
| | **3956** 20:22 | **6** |
| **2015** 13:18 16:17 17:11,19 18:11,14 19:19 56:3 | **3:00** 37:18 | **6** 21:16 91:17 93:23 114:14,16 |
| | **3rd** 53:13,14,23 54:9 71:24,25 72:5,12,17 73:22 74:19 80:13,17 81:11,25 82:1,3,4, 6,7 83:20,23 84:11 85:2,8 86:5,17 87:17 90:3,4 94:14,15,16,20,21, 23 95:21 96:1,4,7, 15,17,24,25 97:6 98:12,19 99:17 100:19 102:8 | **60** 16:19 |
| **2016** 17:19,20,22 18:10,14 31:9,11 | | **60,000** 16:15,18, 21 |
| **2017** 8:5 28:1 37:18 54:25 101:4 | | **7** |
| **24** 55:8,12 | | **7** 21:18 38:17,18 |
| **2423** 21:1 32:16 | | **700** 60:12 |
| **2425** 21:1,11 27:2 | | **73** 107:1 |
| **24th** 8:14 20:22 22:18,22 66:22 77:16 | | **8** |
| | **4** | **8** 101:17 |
| **250** 33:7,11,12 | **4** 8:5 20:23 22:16, 17 37:18,22 93:21 95:14 106:23,25 | **8493** 21:18 22:1 |
| **25th** 66:22 | | **873-5263** 25:24 |
| **27th** 20:21 | **4,000** 31:5 | **88** 9:10 |
| **28** 10:17 | **400** 60:13 | **89** 39:20,22 |
| **28-year-old** 11:8 | **414** 25:25 64:24 | **8:00** 96:18 108:7 |
| **2:00** 110:14,15 | **414-551-5922** 65:3 | **9** |
| **2:30** 110:15 | **43rd** 22:5 | **9** 14:19 |
| **2:42** 115:14 | **4678** 14:19 | **900** 51:15 52:9 |
| **2nd** 53:24 71:25 72:16 74:18,19,21 75:2 79:4,7 80:5 82:8,9,10,12 83:19 84:4 94:13,19 95:16,17,24 | **47** 8:18 | **90s** 41:11 |
| | **4:00** 104:23 | **975-7731** 65:1 |
| | **4:30** 104:23 | **99** 41:13,15 |
| **3** | **4th** 83:20 | |
| **3** 20:19,20 75:13, 15 87:21 92:8 107:1 | | |
| **3-3-17** 92:14 | | |

EXHIBIT C
Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 32 of 42   Document 10-3

**A**

a.m. 37:18

abating 9:19

accelerant 98:18

accepted 5:24

access 69:11

accident 4:21

account 31:21
35:9 51:18 53:23
89:14,17

accounting 51:21

accounts 34:23
35:12 36:1

acquired 13:3,12
19:18

acquiring 13:6

action 51:19,22

actual 105:9

ad 73:2,3,10,11,12

add 49:7 63:16

addition 12:23
59:13

address 8:13
22:21 73:12

addresses 22:11

Advanta 30:23,24

affidavit 37:10
38:6

age 8:17 23:23

agent 12:7 57:13,
15,20

agree 112:2

agreement 7:24
54:21 75:15

ahead 15:11 73:19
90:19

ahold 24:16

altogether 24:2
51:15

American 32:5,9
42:13

amount 30:16
31:4 32:24 67:24

**Analysis** 101:18

**Analytical** 101:19

angry 60:24 67:1,
2,3

answering 6:21
7:16

anticipating 69:5

apartment 45:7

apologize 101:17

appeared 37:9

appears 38:6

applies 5:10

approximately
10:3 13:4 41:9
50:18 65:8 66:15

April 13:18 101:4

area 26:6

arrived 104:25
105:5,7,12 108:20

asleep 104:24

assets 43:1

assistance 43:10
52:22

assume 7:7 14:17
21:21 32:13 34:8
53:3 58:23 68:21
84:16 86:10 89:16

**Assuming** 55:12

attempt 55:19
56:1

attention 83:4

attorney 36:25
37:4 47:6 52:5

August 44:19,24
50:21,22,23 56:8

authored 101:19

authorization
91:10

avoid 6:17

aware 10:21 102:6

**B**

B-R-O-U-G-H-A-
M 39:24

back 7:4 9:14
30:24 41:7 48:23,
24 49:1 50:11 52:1
56:21 57:22 68:2,
9,11 63:16 70:5,11
71:2 85:15 102:22
104:17 105:17,21
106:14 107:24
109:12 113:4

background 8:12,
22

bad 70:24

bags 109:6 115:4,
5,6

balance 29:8,11,
14,16,17,19,24
36:1 53:23

bank 29:23 30:6,9,
10,13,18,19,20
31:13,16,17 34:23
35:12 89:14,17
90:22 91:1

bankruptcy 35:15
38:11,15

basically 25:4
28:21 37:12 51:17
59:4 80:20 96:11
100:7 109:10
115:12

bathroom 56:25
57:3 60:22 61:19
63:7 71:13 83:18,
25

bathrooms 57:1

bedroom 63:1,2

bedrooms 63:3,4,
10

beds 68:12

beginning 92:13

Behr 114:21

bent 22:13

big 46:12 61:7,10,
12

bill 14:16

blls 14:12 22:10

birth 8:17

bit 56:25 64:3
104:18 110:22

**Bloom** 64:14

blue 73:4

boarded 12:21

book 73:2,4,5,6,11

bottle 98:25
100:13,18

bottom 87:25
111:8

bought 13:19
14:3,5,9,10,11
20:1 35:4,6 45:2,
11,16 48:14 50:18
65:24

box 45:25

branches 91:8

breach 111:19

break 38:4 56:16
83:17,24 107:9,11,
15 108:14,15
111:25 114:13

breaking 80:24

briefly 4:18

bring 53:18

broke 112:16

broken 46:14
69:20

brother 23:19,20
25:13,20 26:17
27:11,13,16 43:6

brother's 25:14

brothers 23:24
24:4 26:2,5

Brougham 39:25

brought 19:4

brown 71:2

brushes 115:1

bucks 46:9 52:9
60:12

Buick 39:20 40:12,
13,15,18,20 41:7,
9,13

bumper 42:7,8

bunch 93:10

burned 42:9

burnt 42:1 77:11

**Business** 36:4

busy 107:10

buy 13:17 14:23
65:23

buying 15:14

**C**

C-E-L-I-A 24:11

C-R-A-F-T-O-N
4:9

Cadillac 39:22
40:8,12,15 41:13,
15,17,20

calendar 72:9,10

call 11:25 54:10

called 4:2 73:21
78:3 103:5,7,13
104:19 105:1,3

calling 72:22,25
73:1 75:17 78:13,
17

calls 24:24

Capital 29:21,24
31:23

Capitol 110:19

car 4:20 39:18,19
40:1,2,3 76:23
109:9

card 29:4,13,21,23
30:9,10,13,14,19
31:16,18,19,24
34:1,2 55:25 66:1

cards 29:6,18,20
32:3 33:24

care 15:18 16:3,7
17:16 23:4,13,16,
18 26:17,18 43:5
84:15 107:7

carpet 49:13
50:13 70:19,22
71:1,14 80:25 81:3
82:2,4,6,23 83:9,
13 87:9,11 94:2,13
96:8 97:22,23,24
98:3,6

carpeting 71:3

carrier 40:17 41:1,
6 42:14

EXHIBIT C

carry 29:8,14

carrying 29:17

cars 40:4 109:17,
19

case 71:20

cash 15:5,6,8
53:18 65:25 66:2
89:13,14 91:2

Casualty 42:13

catch 107:10

caught 66:9,11
78:19 88:25 89:21

Cella 24:9 26:8
37:14,16 38:6
110:23

cell 24:14,19,23
38:21

Center 9:22

certificate 9:18,19

certificates 9:20

cetera 8:11 39:1
51:23 92:11

change 17:21

changed 91:8
111:22

Chapter 38:17,18

charge 68:6

charging 88:13,14

cheaper 89:9

check 33:8 52:23
53:16 55:22 69:23
70:5 88:18 91:2,3

checked 70:11

Chi 103:16,17
104:13,19

children 10:16,18,
21 11:14 26:13

children's 11:2

Circuit 44:10

circular 87:15,16

city 13:19,24 14:11
20:1,22 45:17
64:12

claim 38:24,25
39:1,5,15 40:5,9

42:20 112:4,8

claims 39:3,13
42:21,22 51:18,21
67:23 71:20

clarify 4:25

class 9:18

clean 5:19 6:3,22
109:4 115:1,3,8,11

cleaned 94:6
109:11 115:7,10

cleaning 68:18
100:1,21

clear 4:25

clip 42:4,6

close 17:8 65:11
110:13

closed 36:1 70:13

clothes 97:17,19

clubs 76:6

coats 63:16

code 56:12,14

collected 101:21

color 71:1

communicate
92:16

company 33:25
36:16 42:16,17

complaint 54:23

completed 9:11,
14 71:23,24 80:5,
8,21 84:25

complies 8:3

comport 55:13

concerns 112:3

concluded
115:14

condition 29:2
40:22 41:22 46:13,
22

confusion 5:25
7:6

consistent 26:24

construction
10:6 15:16,19
23:3,8

construction-
type 9:20

contact 64:21
75:6 77:25 78:5

contacts 75:20

Continental 30:7,
18,19

continue 85:9,16

contractual 79:23

controlled 79:16

conversation
6:15,17 105:14

copies 36:19 90:6
93:17

copy 44:6,12
87:21 90:5,9,12
91:2,5 114:18

correct 17:4 20:7
43:23 44:8 53:3
55:12 57:7 79:4
97:25

correctly 11:24
101:24

cost 46:2 49:4

costs 59:2

County 44:10

couple 83:20 86:6
88:24 108:22

court 5:3,9,17
6:13 7:4 44:10,12
52:7

courtroom 5:8,11

Crafton 4:2,8,9
37:17

crap 67:20

crashed 40:25

crashing 40:24
41:24

crazy 54:17

credit 29:4,6,18,20
30:2,10,13,23
31:16,18,24 33:24
34:2 35:4 51:23
65:25

cross 76:10

curb 67:18

current 8:13,17
29:24 77:13

cussing 67:7

cut 62:20,21 63:13
92:10

cutting 11:21,22

D

damage 39:6,9,13
51:22 59:13 64:1

damaged 40:24

damages 59:7
60:14,19 71:19

dark 75:4 79:4
85:21,23 87:18
95:4 107:19,21

date 8:17 9:8 55:8
90:2

dated 90:2,4 101:3

day 25:2,3,6 64:21
68:25 70:7 74:5,22
76:15 80:11,22
81:5,7,10,13,24
83:10 84:15,21
85:14 87:2 93:3,8,
13 95:25 107:7
109:1

days 12:19 30:24
60:2 63:18,19
80:15,16 83:20,23
88:24 94:22 95:23

debit 30:10 31:18,
19 65:25

debris 92:11 94:3
101:20

debt 29:4

December 53:10,
19 55:6,21 56:1,9
57:12

decide 54:18

delinquent 33:4

department
102:16,18 104:16,
25 105:2,11,23
106:5 111:16,25

depends 29:15

deposit 51:3,6,10,
14,16 54:7 77:5,6

89:14 91:14,15

deposited 89:16,
25

depositing 89:24

deposition 4:13
5:2 79:16

Depot 34:1,2
65:24

description 8:21

detail 79:13

Development
9:22

diameter 61:11

diploma 8:23

directly 31:21

disabled 23:22

discontinued
18:2

discuss 11:15
92:20

discussed 11:13
33:24 92:18 93:1,3

discussion 7:12
37:6 55:10

Division 8:25 9:9

documentation
37:8

documents 7:23
35:7 59:6

dog 109:8

dollars 65:11
88:12 89:10 91:14
96:3

door 12:9 69:21
70:3,4,5,11 103:5
112:23 113:4

doorjamb 65:22

doorjambs 65:21

doors 60:23
63:20,21,22 64:1,4
65:18,23 79:10
80:9,24,25 81:2
102:9 109:12
111:19,25 112:17,
20 113:4

double 7:2

EXHIBIT C

| | | | | |
|---|---|---|---|---|
| **downstairs** 96:11 97:11,12,13,16 111:11 | **Eleventh** 9:13 | **exterior** 63:21 | 108:22 109:3 | **framing** 64:2,3,4 |
| **draft** 38:3 | **elimination** 21:21 | **extra** 93:17 | **fire** 4:22,23 8:4,9 10:21 11:13,18,22 | **frankly** 47:9 57:9 |
| **drafted** 100:24 101:4 | **employee** 15:22 | **F** | 12:1,5,6 43:23 47:1 60:2 66:9,11 69:16 77:18,19,20, | **frequent** 76:4 |
| **Dream** 32:6,9 | **employment** 10:9 18:3 | **face** 76:1 | 22 78:1 89:21 98:17 102:13,16, | **freshly** 94:1 111:22 |
| **dressers** 68:12 | **empty** 99:5 100:13,18 | **faces** 104:2,3 | 17 103:3,4,6 104:16,25 105:2,8, | **Friday** 72:13 |
| **dried** 98:4,7 99:24 | **enamel** 114:24 | **facing** 104:1 | 9,10,11,17,21,23 106:5 111:16,25 | **friend** 27:6,7,9 75:8 |
| **drills** 86:6,20 | **end** 29:12 55:21 59:24,25 106:7 | **fact** 14:9 112:12 114:5 | 113:14,22 114:7, 10 | **friends** 64:16 |
| **drinking** 110:10 | 109:1 115:2 | **facts** 8:8 10:19 77:19 112:2 | **fist-size** 61:9 | **front** 7:21 41:25 42:2,4,6 70:3,4,11 |
| **drop** 18:12,14 53:16 | **ended** 18:6 | **fair** 6:11,23 7:8 | **fix** 62:18 63:18 | 104:2,3 106:23 109:12 113:4 |
| **dry** 62:23 63:14 | **entire** 71:14 | **fall** 38:25 | **fixed** 58:3,4,14 65:13,15 83:8 | **full** 27:7 29:13,16 |
| **drying** 97:17 | **entry** 69:20 111:24 112:20 | **familiar** 42:16,18 | **fixing** 48:19 56:10, 17,21 66:8 103:10 | **furnace** 47:24 48:1,19 50:2,4,6 |
| **drywall** 46:17,18 50:15 62:22 | **essentially** 79:18 | **family** 18:19 27:15 | 104:14 | **furnaces** 45:22 |
| **due** 53:12,14,24 54:3 | **estimate** 49:10 | **Farm** 48:13 77:25 78:3,5,6,12,16,23 | **Fleetwood** 39:23 | **furniture** 67:20 68:11 |
| **duly** 4:3 | **evening** 84:22 85:18 | 79:1 112:2 | **flip** 87:24 | **G** |
| **duplex** 89:9 111:5 | **Eventually** 115:7 | **fast** 93:1 | **floor** 49:16 63:8 71:4 101:21 | **G-R-A-N** 43:19 |
| **duplicates** 22:3 | **everyday** 6:15 | **February** 59:19, 20,21,24,25 60:7 | **floors** 111:9 | **gambling** 35:24 |
| **E** | **evicted** 43:16 53:3 113:24 | **Federal** 35:4 | **fluctuate** 16:25 | **gasoline** 98:13,15 101:20 102:4,6 |
| **earlier** 108:13 113:1 | **eviction** 44:8,24 54:19,19,25 55:4 | **fee** 58:23,25 | **follow** 5:19 | 112:1 113:18,21 |
| **early** 31:11 85:13, 23 107:19 | 60:25 | **female** 106:4 | **follow-up** 80:6 114:19 | **gave** 5:5 22:4 32:23 51:15 60:17 74:19 78:6,12,16, |
| **easier** 82:21 | **examination** 4:5, 14 5:1 7:18 | **figured** 75:23 | **foot** 61:11 | 25 87:19 90:6,12 93:6 111:18 |
| **easily** 50:25 | **examined** 4:4 | **file** 54:18 | **forced** 69:20 111:24 112:20 | **GED** 9:4,6,12 |
| **east** 104:2,3 | **exchange** 84:10 | **filed** 17:4 35:15,22 38:15 44:8,24 | **foreclosure** 13:21 | **generally** 5:24 |
| **eat** 110:17 | **Excuse** 38:22 | 51:19 52:7 54:25 55:4 | **foreclosures** 13:24 | **get all** 50:17 68:20 |
| **educational** 8:22 | **exhibit** 14:14,16 20:23 21:1,12,16, | **files** 52:1 | **forgettable** 50:25 | **give** 5:20 6:20 8:21 36:25 45:15 |
| **electric** 28:21 45:22,24 47:11 | 19 37:12 38:7,8 75:13,15 87:21 | **filing** 58:23 | **forgot** 35:1 43:17 84:19 | 54:13 59:4,7 89:10 90:22 91:4,24 |
| 48:18 49:25 50:6 77:23 102:16,17, | 92:8 93:21 101:3 106:23,24,25 | **filled** 92:7 | **form** 15:7 36:23 37:2 73:17 79:12 | 93:5,15 |
| 18,21 105:16,18, 20,22,23,25 114:2, | 114:14,16 | **finally** 57:12 80:16 | **forward** 29:14 | **giving** 49:10 56:16 |
| 4,6 | **exhibits** 93:18 | **Finance** 30:7,18 | **found** 14:6 75:22 104:19 | **Glidden** 114:21 |
| **electrical** 29:1 114:7 | **expected** 9:8 | **financial** 36:1 | **Founders** 42:17 | **Globe** 42:13 |
| **electricity** 86:8 | **experience** 90:25 | **find** 31:14 72:3 76:12 | **frame** 73:18 | **good** 97:14 112:11 |
| **eleven** 108:24 | **explain** 18:15 37:11 63:20 | **fine** 49:12 58:17 65:9 | **frames** 65:21 | **governmental** 43:10 |
| | **explanation** 102:3,13 113:13, 17 | **finish** 80:11 107:24 | | |
| | | **finished** 80:19 | | |

EXHIBIT C
Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 35 of 42   Document 10-3

grabbed 22:4

grade 9:11,15

graduate 9:1,2

graduated 9:2

graduation 9:8

grand 60:14

Grandy 43:19,20
44:3 45:5,12 47:1
48:5,22 49:13
50:25 51:1 58:20
66:6 74:22 79:6
80:3 82:14,17
102:25 113:23

grass 11:21,22
92:10

great 46:9 101:18

gross 17:20 18:11

ground 5:15

guess 22:18 28:18
51:23 54:5 67:10
70:7,14 87:23
94:12 95:6 104:1
107:16 111:13

gutted 47:22

guy 64:9 66:23
75:8 86:11

guy's 64:15

guys 68:15 107:25

---

**H**

habitable 45:18

half 62:15

hand 87:14

handed 73:7

hands 61:13

handwritten 37:9
90:10

happened 8:9
10:22 12:6 18:15
41:20 47:2 61:21
62:4 69:16 77:21
94:17,18 105:15
109:3 113:14

happening 61:1

hard 91:9,21

---

head 5:21,22,23
6:1 47:15

headache 18:18
19:8

health 15:18 16:3,
7 17:16 23:4,13
43:5

heard 110:25

hears 111:2

hell 92:5

helping 64:7,8
67:13,14

helps 28:22

Hey 76:10

high 8:23,24

highest 9:11

hire 28:18,20

hired 50:6

holding 61:13

holes 46:14 60:21
61:5,7,9,10,12
62:16,25 63:10,18,
23,24 65:14,15
71:13 80:12,23,25
81:2,14,15,19

holidays 55:24

home 34:1,2 37:22
65:24 106:14
109:21 110:16,20,
23 111:13 115:8,
11

hot 109:21

hour 16:5 26:21
62:15 68:22 71:12

hourly 15:24,25
16:1

hours 26:22,23
62:15,20 68:1
71:25 108:22

house 11:20,22
12:1,5 14:4 24:18
25:7 36:17,18 39:6
43:15 45:25 46:4,
8,11 47:20 48:4,14
49:19 53:17 56:4,
10,11,13,17,19
57:9,13,20 60:23
66:7,9,10 69:7,20
70:18 71:3,5,15

---

72:1,3 73:21
77:10,11,12,21,24
82:22 85:25 86:1,
8,14 89:8,20,22
93:2,9,10,14
95:15,25 96:7,9,14
98:15,18 100:18
102:6 103:6,10,12
104:1,2,3,4,7,8,12,
14 106:19 108:7
109:10 111:4

houses 18:16,20
19:21 50:20

housing 19:5,16

Howard's 36:4

Hs 6:7

hundred 30:5

hurrying 72:3

---

**I**

idea 16:12 90:14
114:9

identified 101:20

imagine 14:13
54:10 68:4 106:16

impaired 23:23

important 70:14

inception 55:8

inches 61:13

include 19:18
54:5,6 59:13

included 49:4,6

includes 58:23
59:2

income 16:12
17:15,20,21 18:10,
11,12,17 19:4
43:3,5,8 53:1

individuals 72:19

information 8:12
78:4,6

injury 39:1,3

inside 46:13
49:22,23 50:9
57:20 66:10 71:3
85:25 86:8,14
98:3,18 99:3 102:6

---

105:21

inspector 77:22

install 98:6

installed 48:2
96:8 97:22,23

insurance 12:7
38:25 40:5,9,17
41:1 42:14,17,22
55:17,19 56:4,12

interest 33:17,18

interested 73:15

interior 63:21,22
71:14 81:8,9

interrupt 6:16

interruptions
6:18

IRS 36:25

issues 112:7

itemize 68:1

itemized 52:3

itemizing 51:22

items 96:14

---

**J**

J's 109:24

J-A-Y-'-S 109:25

J-O-N-I-K-A 11:11

jail 54:14

January 53:10,11,
14,23,24 54:2,9,
24,25 55:3,6,8,12
59:18,20,24 60:7
72:4,7,9

Jennifer 74:7,8,10
77:2,3 106:19

job 18:6 23:3,4
32:13,17,24 84:13,
14 107:7

jobs 23:7,8 99:14

Joe 7:10

Jonika 11:9

judgment 58:19
67:23

judgments 34:13

---

July 44:19,24
50:23 56:8

junk 68:20,21

---

**K**

K-E-N-T-R-E-L-L
11:5

keeping 16:24
29:2 83:7 85:10

Kentrell 11:3,4

keys 69:14,17
93:5,6,15 102:11
111:23 112:13,21

kick 67:5

kicked 43:15
63:25

kids 10:10,11

kind 6:14 19:11
34:21 38:25 39:19
95:16 98:22
107:10 114:19

kitchen 49:16
86:16,19,21,22,24
87:1

knew 11:16 36:15
75:8 108:12,13

knowledge 98:17

KRILL 7:10,24
15:7,11 21:9,13
22:16 33:11,16
37:5,16 38:3,22
72:7 73:17 79:11,
17,20,24 82:17
90:14

---

**L**

laboratory
101:18,19

ladders 86:6,20

ladies 103:11

lady 36:14

laid 17:23

Lakes 101:18

late 75:3 82:10

latex 114:23,25

EXHIBIT C

lawyer 7:23
111:18

lay 87:8

laying 15:5,8 94:3,
15

lead 9:19

leaking 61:24

learn 103:4

lease 27:10,12
44:3,4,12,15,16
84:9 85:1,12
87:19,22 88:7
92:7,13,17,22,24
95:2,3,7,11 96:3
106:20 107:23
108:1,4

leave 67:15,19,21
68:11 92:5 106:19
112:23

left 26:16 38:11
67:17 68:17,23
69:5,8 70:7 85:6,
15,19 86:4,18 87:3
96:17,20,21,23,25
98:12,18 99:3,15
100:19 102:8
104:5,6,7,8
109:11,13,17,20
111:24 112:15

legitimacies
112:8

legitimacy 112:3

letting 79:22

leveled 56:21

liens 34:13

life 8:19

Lift 49:1

light 111:2

Lillian 43:17
102:19

limit 30:2 34:6

lined 73:14,15

Liquid 15:10

live 25:8,9,12 26:5
27:1,5,7 43:25
44:20,21 59:21
77:13,15 103:24
111:4,6

lived 8:15,19 26:8,
13 43:21 47:1
56:5,8 57:3

lives 25:10 27:9,17
111:8

living 26:10 27:15
56:13 71:5,7 98:7

loan 15:3 30:24,25
31:4 32:7,10 34:17

location 101:21

lock 112:23

locked 63:24 70:8,
13 102:8 109:12
111:23 112:15,16,
21,24 113:2,3,6,7,
9

locking 113:10

locks 68:23 69:4,
8,9,14,17 111:22

long 7:2 13:14
19:15 21:7 26:8
35:18 36:7 42:19
58:10 62:14,17,18
68:6,20 71:11,25
80:14 104:13
106:9,11 108:16
110:12

looked 51:12 84:4
87:1 94:4,5,12
95:15,25 97:12

Lorenzo 64:9,11,
18,25 108:19,25

loss 10:19 11:13
24:4 25:21 27:25
43:4,12

losses 35:24

lost 60:19

lot 4:19 47:10
55:22 60:23 65:14
67:20,21 72:22
76:11 97:8 99:21
110:5,9

lower 25:8,9,11
63:2,3

lump 14:24

lunch 107:9,11,14

─────────────
        M
─────────────

M-A-R-C 25:18

M-A-R-K 25:18

M-O-O-R-E 4:11

mad 67:6

made 38:24 40:5,8
70:13 79:24

mali 73:7

majority 86:23

make 7:2 16:3
24:3 26:17,20 38:1
56:11 70:8

making 16:18,22,
23 17:6 100:1

male 106:4

March 8:5 28:1
37:18,22 60:4,5
72:8 91:17

mark 25:15,16,20
37:11 38:2 93:18,
20 101:3

marked 14:14
38:8 75:13,15
87:21 92:8 114:14

marking 38:5
114:16

married 10:10,12,
14

materials 86:7

matter 14:9

meaningless
79:19

means 6:8 37:11

meant 33:13

mediator 19:11

meet 76:19,24
77:1,3 93:14
106:19 110:4

meeting 89:2

members 27:15

mentally 23:23

mention 95:21

mentioned 25:22

Mercury 34:22

merged 34:25

mess 115:9

messed 61:22
70:25

met 84:16 85:11,
15 87:17 96:1
104:15

MFD 104:18

Michael 101:4

Milwaukee 8:14,
19 26:6 35:22
44:10 104:16
111:16,24

mine 46:12 75:8

minimum 29:13

minor 56:20

minute 75:16

minutes 108:18

missed 59:14

missing 78:18

mistaken 41:18

Mister 5:4

molding 99:11,12

money 30:14
31:20 32:4 33:8,9,
23 34:15 48:4 68:9
74:5,20 77:4 83:22
84:10 85:12 87:19
88:10,16 89:3,16
90:2,7,10,13,17,20

month 12:17
18:23 29:12 33:11,
12 59:24 69:7 72:2
88:15 91:16

month's 51:9

month-to-month
44:15,17 92:22,24

months 44:22,23
59:16

Moore 4:2,8,11,13
11:3,9 24:9 25:15
26:19 27:1 37:14,
16,17 38:7

morning 85:13
93:8 104:23
106:12,13 114:2,6

mother 75:23,24
76:3,8,13,14,20
88:25

mother's 22:19
75:25

motive 113:20

motor 41:6 42:2,4

move 44:18 52:14,
19 59:23 67:13,14
68:1,5 72:2,3 93:2
94:7 97:15

moved 8:11 45:12
48:5,22 49:13,17,
19 50:21 51:8
52:13 54:7 56:18,
23 60:1,2,5 61:3
66:13,14,24 67:18
68:14,15 69:19
70:1,8,19,22,23
74:24 79:6,9 80:3,
11 89:8

moves 52:9,10
72:13

moving 6:17 45:5
66:18 67:8 69:4
93:1

mud 62:23

multi-day 63:12

multiple 18:24
63:10 104:11

mutual 75:20

─────────────
        N
─────────────

named 64:9

names 11:2 64:9,
10

Natasha 36:15

nature 105:14

needed 45:20
47:24 56:18 80:7
82:23,24

negative 7:2

neighbor 104:9,
10

neighbors 103:7,
9

nice 66:23 100:2

night 74:18 79:4,7
80:4,15,17 82:10
84:21 85:3,4 94:25
102:8 106:18

EXHIBIT C

Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 37 of 42   Document 10-3

110:6,11 114:1
115:2

**nod** 5:23,24 6:1

**nodding** 5:21

**non-sworn** 38:6

**noon** 72:13 80:3

**North** 8:14 9:22,
23,24 10:2 14:19
15:21 16:7 17:16,
23,25 18:3,9 20:6,
21,22 21:1,11,15,
18,23,24 22:1,5,22
23:3,10 27:2 32:16

**number** 14:18
24:12,21,25 25:1,
23 78:14 103:21
106:24

**numbered** 101:17

**numbers** 64:23

---

**O**

**oath** 4:3,14 5:2

**object** 15:7 79:11

**objection** 73:17,
19 79:25

**Objections** 79:18

**obvious** 112:3

**occasion** 25:5

**occurred** 8:4

**October** 59:17

**odd** 23:7,8

**offhand** 16:15,20
17:14 24:13,22
40:19 41:5 42:12
58:13 78:11
102:15 105:6

**officer** 106:2

**oil** 114:23

**old-age** 23:22

**on-line** 14:6 30:21

**one-family**
104:12

**order** 5:19 33:8,9
45:20 74:20 83:22
88:10,16 89:16
90:2,7,10,13,17,20

---

**Orlando** 64:11,12,
18 65:2 108:19,25

**overhaul** 45:23

**overview** 45:15

**owe** 30:14,25
31:20 32:3,5,10
33:23 34:1,4,15

**owed** 54:1,2 60:6

**owing** 29:11 36:2

**owned** 13:14,23
14:21 21:4 38:14
56:2

---

**P**

**p.m.** 115:14

**packing** 109:8

**pages** 14:18
101:16

**paid** 20:12 30:15
31:8 33:1,15 41:1
53:19,25 65:6,8
68:4 86:11 89:13

**paint** 49:19,22
71:18 82:1 83:11,
12 94:14 96:6,9,12
97:16,20 98:4,7,
20,23,24,25 99:3,
7,8,10,16,19,23,
24,25 100:1,4,9,
10,13 109:5,6
114:19,23

**painted** 50:9
65:13 81:23 94:2
96:8,11 97:24 98:2

**painting** 50:13
80:19 81:8 82:6,
24,25 83:9 86:7,20
96:6,10 97:2,3,8
98:7 99:18 100:7

**panels** 42:8

**paper** 17:12 115:5

**papers** 7:21 36:4

**parents'** 14:4

**Parkway** 14:19
19:25

**part** 20:2,9,20,21,
24 21:22 28:10
42:4 70:14

---

**parts** 42:5

**patched** 80:12,23
81:2,14,15,19

**patching** 80:25

**paths** 76:10

**pay** 27:13 29:12,
13,15 30:16 31:2
32:20 33:8,21
51:5,8 53:16
54:10,15 60:20
65:25 84:4 88:6,9,
20 89:7,12

**paying** 32:22 51:1
53:4,6,9 83:3

**payment** 14:24
29:14 31:15 32:23
33:2,6

**payments** 30:7
31:23 33:4

**PCW** 15:16,17

**penalty** 5:10

**people** 6:16 12:8
18:24 19:10 28:24
47:17 49:9 52:18,
23 56:12 64:10,18
67:14 72:1,22
73:20 103:5 110:5,
6,9

**perjury** 5:10

**Perreault** 5:5
33:17

**person** 14:10
15:18 16:4 52:16
73:25 74:3,4,13
75:9 112:16 113:9,
23

**personal** 15:18
16:3,7 17:16 23:4,
13 26:17 39:1,3

**phone** 24:12,14,
19,23 25:23 38:21
64:23 78:14
103:21

**photos** 46:21,25
47:4

**physical** 73:5,6

**pick** 64:14

**picked** 100:22

**piece** 56:21 62:22

---

90:20

**pipes** 62:12

**place** 11:18 20:23
32:8,11 49:14
72:23 73:10 75:18
77:16 81:23 83:16
98:2 110:18
112:15

**places** 76:4,5
86:23

**plan** 33:2,6

**planning** 93:12

**plans** 32:23

**Plastic** 115:8

**plumber** 62:6

**plumbing** 28:21
45:22 47:13,16,19
48:18 49:25 50:6
60:22 61:18

**point** 52:12 54:18
85:15 108:6

**police** 66:20
105:11,13,19,20
113:25

**policy** 55:2,8 56:2
57:8,13

**porch** 48:24

**portion** 59:2

**portions** 93:22

**positive** 95:16
102:4

**preparation** 7:19

**presence** 112:1
113:17

**pretty** 55:7

**prevent** 7:15

**previous** 53:25
99:14,25

**print** 91:3

**printed** 93:17

**prior** 4:14 9:11
13:6,11,14,23
14:21 15:14 16:9,
13,14 21:4 22:23
36:9 43:13 54:2
60:7 69:9 75:17
101:6

---

**problem** 77:23

**problems** 35:7
55:16 82:22

**proceedings** 4:1
115:14

**process** 21:21

**program** 9:4

**prolonged** 55:17,
25

**proof** 52:25 53:1

**properties** 10:7
12:24 13:1,6,9,11,
15,17,21,23,24
14:18,21,23 15:14
16:9,10,13,14,25
17:2,17 19:18,23
21:5 22:10,24
23:1,6 27:16,20
28:1,23 29:2 34:9,
15 38:14 39:7
42:25 43:8 48:8
77:13

**property** 12:18,24
19:25 20:6,7,12,
15,20 21:7,9 22:7,
9 27:3,10 32:15
39:1,2,5,13 43:21
45:2,9,11,13,17
46:21,25 48:13,20
55:2,20 56:2 59:13
65:6 69:11 70:7
73:16 77:15 79:3,8
80:4 81:18,21
84:25 85:8,16,24
87:2 113:21

**provide** 44:12
47:6,10 48:12 52:4

**provided** 47:8

**provider** 16:8
43:5

**pull** 72:10

**pulls** 31:21

**purchased** 20:9,
22,24 23:1 28:11
46:22

**purchasing** 16:9,
13,14 21:4 22:23

**purpose** 25:5

**put** 33:6 48:4
49:13 51:3,13
62:23 63:13 66:22

---

EXHIBIT C

67:16,18,24 94:13
97:24 98:3 106:10
109:6,9 113:21

**Q**

question 6:20,22
7:1,6 15:8 18:7
73:18 78:21 79:12,
21 80:6 82:21
94:1,3,6,12 95:6
107:5,8

questions 4:19
7:18 114:19

quick 38:4 100:24
101:4

quickly 8:2 14:13

**R**

rang 38:21

rate 16:1 68:6

read 7:4 37:15,25
93:21 94:7 95:19
101:24 102:22,23

ready 73:22 83:19
94:6 109:21

real 24:3 100:2
103:14 112:11

reason 6:6,25
18:2,4,8 32:9,20,
22 33:1 114:5

reasonable 68:6

reasons 112:10,
11

reattach 62:9

recall 11:12 16:19
20:12 41:4,9 47:15
82:21 95:15 100:3
110:8

receipt 90:9,10,21

receipts 47:8,10,
11 48:7,12 59:9,10
66:3,7

receive 9:21

received 22:9

recess 38:9 84:2

recollection
11:17 55:13 83:5

record 5:1 6:4,11
7:11,12 20:19
37:5,6 55:9,10
79:25 86:17
114:16

recorded 5:6

records 30:6 92:4

recovered 40:20
41:20,21,22 42:11

rectify 7:5

redo 45:24 47:19
60:21 61:18 64:4
86:11

reduction 18:9

reframe 48:25

reframing 50:11

regularly 28:25
64:19 65:4

rehabbed 28:6

rehabbing 28:13

relationship
66:25

relative 23:16,18

remainder 77:4

remember 17:14
35:18 36:23 37:1
41:19 42:12,23
44:5 64:10,15
78:11 90:3 96:5
97:10 101:9,11,14,
15 110:10

remodeling 56:24
57:5

remove 92:10

remover 98:20

renovation 84:25

rent 18:23 19:15
27:13 45:20 51:1,9
53:4,6,7,9,12,14,
19,24,25 54:3,10
56:16 59:14 60:6,
8,19,20 77:10,11
83:16 87:5,7,8
88:13 89:8 103:11

rental 39:7 75:15

renting 18:19
19:2,7 52:15

repainted 70:18
71:14

repair 48:13

repairs 48:19 59:3
66:5 86:18

rephrase 7:3

replace 46:19
49:17 62:12 64:4
65:19 68:23 71:1

replaced 47:22
58:14 65:15,18,22
69:8,9,10 71:5
81:21

replacing 69:5

report 100:24
101:3,6,16,19
111:17

reporter 5:3,9,17
6:13 7:4

require 98:13

rest 29:23 88:20
89:2

restaurant 103:19

restructure 48:24

Retainer 7:24

return 37:1,3

returns 17:4,6
36:19

review 7:18

rewire 46:4

ride 109:18

riding 76:18

ripped 81:2

rollers 109:5,6
115:1

rolls 54:9

roof 39:10 55:22
57:16,18 58:6,12,
14,17

roofing 32:8,11,13
33:25

room 19:2 71:6,7
98:7 100:6

rooming 18:16,20
19:15,21

roommate 52:12

roommates 44:1
52:11

rooms 18:23 19:7
96:10

rough 49:10

rude 5:16 6:3,10

rules 5:15,18 7:14

rushing 100:7

RYAN 4:6 7:13 8:1
14:15 15:10,13
21:11,14 22:20
33:14,20 37:7,19
38:5,10,23 55:7,11
72:8,11 73:23
75:14 79:15,18,21
60:1 82:18,20
83:24 84:3 90:15
102:22,24 114:12,
15 115:13

**S**

S-C-O-T-T 10:1

S-C-T 10:1

salaried 15:24

sale 14:3

sample 101:21

Samuel 26:19
27:1,13

sand 62:24

satisfied 32:21

save 24:25 26:1

scene 106:5

school 8:23,24

schooling 9:17

Scott 9:22,24,25
10:2 15:21 16:7
17:16,24,25 18:3,9
23:3,10

screw 61:19

Seaway 31:16
34:24,25 35:4,6,10

security 51:3,6,9,
14,16 54:7 77:5,6
91:15

seek 68:9

Self-help 35:2,3,4,
5,6,9 91:25

Self-something
34:25

send 36:24 37:3

sense 7:2 38:1

separate 109:17,
19

September 59:17

service 58:25

set 100:22 112:10

shake 5:23,25 6:1

shaking 5:21

shape 57:10

She'd 53:18

sheriff 66:20 69:6

Sherman 110:18

shift 84:23

shifts 80:14

short 51:11 53:6,
21 54:6 114:13

show 17:6,8 18:11
22:8 73:24 74:1,3,
17 91:1 97:5 101:5

showed 73:25
74:4,10,13,18,21
75:1 79:3 80:4

shower 109:21

side 42:8 104:5,6,
7,8 109:7,10

siding 39:10

sign 14:6 69:19
85:12 88:2 90:22
95:7 106:20 108:3

signature 87:25
88:1,2,4

signed 85:1 87:18,
22 88:4,6 95:2,3,
11 96:3 107:6,23
108:1

signs 111:24
112:19

simple 24:3

single 18:19 100:6

EXHIBIT C

Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 39 of 42   Document 10-3

**single-family**
19:5 111:4

**sink** 61:22 62:1,9,
11 65:16,18 71:13
81:5,6,21 82:8
115:9

**sister** 24:8 27:17
37:20 52:13

**sisters** 23:24 24:4,
7 26:2,5

**sit** 5:2 43:3 49:7
77:18 78:1

**sitting** 101:6
114:9

**sleep** 19:12
106:16 111:14

**sleeper** 111:2

**slip** 38:25

**small** 46:11 51:18,
21 67:23 71:19

**smashed-in**
69:21

**smoke** 105:9

**snapshot** 36:25
37:3

**snow** 57:17 58:7

**soiled** 70:24

**sold** 34:25

**sole** 17:15

**Solutions** 36:5

**sort** 75:3

**sought** 71:19

**sound** 8:5 42:16
54:24 58:20

**sounded** 32:9

**sounds** 42:18

**south** 8:25 9:9
104:9,10,11

**speak** 10:18 24:3,
6 106:5

**specifically** 99:9
100:3,11

**spell** 9:25 11:4,10
24:10

**spoke** 26:2 106:2

**spoken** 24:23

**square** 62:21

**stairs** 71:4

**standing** 66:17

**start** 7:10 113:21

**started** 18:18 61:1
68:17,19 79:9,10
80:9 87:3 96:10
102:14 104:14

**starting** 11:1
105:17,21

**State** 48:13 77:25
78:3,5,6,12,16,23
79:1 112:2

**stated** 102:18

**statement** 5:6
78:12,15,23 79:1
93:21 106:22
114:18

**statements** 31:13
91:9,22,24 93:18

**stating** 37:22
101:20

**statutorily** 79:15

**stay** 25:7 27:6
66:24 67:4 108:3,
16 110:12

**stayed** 85:3 108:5

**staying** 56:15

**stays** 25:11,13

**stole** 39:18

**stolen** 40:3,4 41:7,
10

**stop** 17:25 19:7
53:6,9

**stopped** 23:10
53:4,8,11

**stopping** 18:9

**stores** 73:8

**storm** 39:6 42:20

**story** 54:13

**street** 8:14 20:6,
13,15,20,21 21:2,
11,15,18,23 22:5,
18,22 27:2 32:16
43:21 45:8,13
48:15 67:6 85:8

104:5

**stretch** 87:11

**strike** 16:6,22
26:16 36:9 72:21
85:7

**structure** 57:24
58:1

**student** 32:7,10

**stuff** 19:10 22:4
28:18 48:8 55:23,
24 56:11,20 59:10
60:15,25 63:13
65:14 66:3,8,10
67:15,17,21,24
68:2,5,13,14 69:7
73:9 76:4 80:13,24
85:25 86:7,20,21,
22,23,25 87:3,12
93:10 94:3 99:12
105:15 106:7
109:9 113:10

**subject** 15:11
20:7 73:19

**substance** 78:22

**sum** 14:24

**Sunday** 67:8,9,10
72:4

**supplies** 34:8

**supposed** 76:19,
24 77:1,3,10

**surrounding** 8:8
10:19

**suspect** 17:10

**SUV** 34:22

**switched** 91:23

**switchover** 92:2

**swore** 5:3,9

**sworn** 4:3

---

**T**

**T-BONE** 75:11,21

**T-H-O-R-N-T-O-N**
11:6

**table** 87:13

**taking** 5:17 6:13
79:10 60:9

**talk** 12:11 25:20
43:13 77:17 78:9,
15,21 89:24
104:16 105:11
111:1 113:25

**talked** 22:7 77:20
90:1 95:10 103:22
105:13

**talking** 5:5 21:10
38:11 48:15 73:18
96:23

**tan** 71:2

**tarp** 12:20

**tax** 14:12,16 17:4,6
22:9

**taxes** 17:19 18:11
36:5,7,10,13,14,15

**telling** 11:17 73:21
97:14

**ten** 16:2 48:6
80:15,16 85:4
96:21:25 108:18,
23,24

**tenancy** 44:15

**tenant** 8:10 43:13
45:8 94:4

**tenantable** 28:8,9

**tenants** 17:2 45:6
92:21

**tend** 6:16

**term** 92:16

**terms** 48:13

**Terrance** 75:10,
12,21

**test** 102:4

**testified** 4:4

**testimony** 95:24

**theft** 39:15 42:21

**thing** 23:22 30:21
48:24 63:12 65:13
82:11 90:17,21

**thinks** 92:24

**thinner** 98:23,24
99:1,3,7,24 100:4,
9,10,13

**Thomas** 36:15

**Thornton** 11:3,6

**thought** 21:24
32:9 55:14 93:17
102:15,18,25
112:25 113:1
114:3

**thousand** 30:4
65:11 88:12 91:14
96:3

**tilting** 49:2

**time** 12:18 13:4,7,
12 27:7,25 35:18
43:4 45:2,11,12
53:20,21 56:5 57:8
58:1 66:16,21
69:16 73:11,18
75:1 77:17 78:1
79:6 80:2,4 81:18
83:7 84:18,20,22
85:1,7,10,19 88:6
89:12 91:9,22 92:6
93:6,7,15 96:17,
20,23,24 98:2,3
100:14 105:1,5
107:18,21 108:9
110:20 115:13

**times** 4:16 13:12,
13

**tired** 19:14 109:8

**today** 7:16,18 43:4
77:18 78:2 101:6
114:9

**told** 77:21 83:19
89:9,23 94:18
114:6

**tomorrow** 97:15

**tools** 66:8,10,14
85:25 88:13 87:5,8
94:15 96:14 98:11
109:4,7

**top** 47:15 64:11
110:9 111:8
113:11

**tore** 60:22,25
63:20

**total** 13:1 32:24
59:7

**totaled** 40:23
41:23,24

**track** 83:3 85:10

**traffic** 76:18,21

EXHIBIT C

Case 2:18-cv-00539-NJ   Filed 04/11/18   Page 40 of 42   Document 10-3

transaction 84:9 91:1

transcript 4:1 5:19,22 6:7,19,23

transferred 35:8

trucks 105:8

true 86:25

truthfully 7:16

Tuesday 72:6

turn 93:22 106:22 107:1

twelfth 9:14

Twenty-eight 26:23

twenty-some 41:12

type 23:22

typically 28:20,22 52:23 53:16 90:25

**U**

uh-huh 5:12 6:5,9 20:3 31:25 34:1 46:5 51:24 60:9 69:1 70:15 71:16 84:6 86:12 94:9 98:8 100:15 101:25 106:21 107:2,13

uh-uh 6:8 29:9 100:25

uncertain 78:25

understand 5:10 7:1 8:10 12:23 13:3 79:17 91:21

understanding 11:24

understood 7:7

unhappy 32:19

Union 33:10,21 35:4

unit 111:6

units 19:15 104:11

unlock 70:3

unnatural 6:15

unscrew 12:9

upper 25:8,10,13 63:2,3

upset 113:24

upside 37:15

upstairs 96:10 97:4,5,7,9

**V**

vacant 27:21 28:2, 4 56:4

vague 110:11

varies 28:24

vehicle 34:17,19, 21 39:15 41:6 42:20,24

verbal 5:20

verify 37:17

Viliard 84:15 107:8

**W**

W-2 15:22

wait 6:19,21 56:1 57:18

waited 56:9 57:8

walked 62:3 91:19

wall 48:19 60:21 61:25 62:1,10

walls 46:14 61:5 62:16 71:14 97:20 105:22

wanted 12:11 57:9,16 72:2 83:12 95:9 103:11

water 115:12

Wednesday 72:12

week 26:22 33:7, 11 69:12 77:8,9 89:6,7

weeks 12:16,17

weat 104:2

Western 33:9,21

wet 96:9 97:20 115:5

whatsoever 113:13

Williams 74:11, 17,21 75:7,17 81:18 82:18,23 83:15 85:12 87:1, 22 88:2

Williams' 93:20

window 69:21 112:17,22

windows 46:14,19 48:19 70:13 112:24 113:1,5

wintertime 85:22

wiped 99:19

wiring 45:25

Wisconsin 8:14 35:22

woken 111:14

wondering 37:10

woodwork 99:8,9, 10,17

words 86:10

work 10:6 12:12 15:15,20 26:22 28:6,7,16,23 29:3 32:19,21 36:16 45:13,15,22 46:17, 18,23 47:11,13,16 49:24 50:15 52:21, 24 64:6,18 65:4 67:24 71:22 72:16 79:7,14 80:5,7,8, 10 84:23 86:8 87:6 95:7,12 96:1,22 97:1 108:8,11,12, 13

working 15:21 16:7 17:23,25 23:10 28:13 29:2 50:20 57:3,5 65:6 68:17,19 71:24 80:14 83:6 85:9, 14,16 86:1 87:3 93:9 106:18 108:5

wrapped 115:3

writing 37:17

written 44:15,16

90:9

wrong 53:4 57:7

wrote 88:16 92:10

**Y**

yard 12:12

year 16:12,18,21, 23 17:7 18:13 39:11 44:20,21 50:18

year-and-a-half 31:3,8

years 8:15,16 16:6,21,22 17:9 19:17 26:24 35:13, 20 36:8 38:12 41:12,19 76:7

young 36:14 103:11

Yup 94:2

EXHIBIT C